**Nelson HOOVER, Vernan Cephas, Glen Ducote, et al., Plaintiffs,**

v.

**Commissioner Robert WATSON, Governor Tom Carper, Warden Rick Kerney, ex Warden Stan Taylor, and Acting Deputy Warden Bowan, Defendants.**

**Civ. A. No. 94–179–RRM.**

United States District Court,
D. Delaware.

April 24, 1995.

Plaintiffs, pro se.

Carl C. Danberg, Delaware Dept. of Justice, Wilmington, DE, for defendants.

McKELVIE, District Judge.

This is a civil rights case. At the time they filed their complaint, plaintiffs were pre-trial detainees housed in the pre-trial building at Sussex Correctional Institution ("SCI") in Georgetown, Delaware. Defendants are the Commissioner of the Department of Corrections, the Governor of the State of Delaware, and the Warden, former Warden, and former acting Deputy Warden of SCI. On April 7, 1994, the court granted plaintiffs' petition to proceed *in forma pauperis* and plaintiffs filed a complaint pursuant to 42 U.S.C. § 1983 which alleges various violations of their constitutional rights. On August 5, 1994, defendants filed a Motion for Summary Judgment. Docket Item ("D.I.") 21. On August 23, September 6, and September 12, 1994, plaintiffs Hoover, Ducote, and Cephas, respectively, filed responses to the motion. D.I. 23, 25, 27. This is the court's decision on defendants' motion.

*FACTUAL AND PROCEDURAL BACK-GROUND*

Plaintiffs raise five "claims" for relief in their complaint, alleging various generalized violations of their constitutional rights. In their motion for summary judgment, defendants raise numerous defenses including qualified and Eleventh Amendment immunity, lack of personal involvement, failure to allege injury, and the absence of any evidence to demonstrate constitutional violations. They also attach the affidavit of Richard Kearney which denies the factual basis for many of plaintiffs' allegations and explains some of the prison procedures and policies at issue. In response, plaintiffs have filed affidavits which, to some extent, provide additional facts to support some of their claims, but in large part simply reiterate the conclusions in their complaint. The court will describe the factual bases, as it can discern them, for each of plaintiffs' claims in turn.

A. *Claim One: Conditions of SCI Pre-Trial Building*

In claim one, plaintiffs challenge the conditions of their confinement in the SCI pre-trial building, which they allege constitute cruel and unusual punishment. Plaintiffs claim they are subjected to "unhealthy and unsafe living conditions, including severe overcrowding, inadequate sanitary and health facilities and maintenance procedures."

First, plaintiffs assert that the pre-trial building is divided into six cells, which at the time of their detention housed "over 100

unsentenced pre trial detainees." Plaintiffs estimate the dimensions and relevant populations of each cell as follows: Cell 1 is 8' × 20' and held 14 men; Cell 2 is 12' × 20' and held 22 men; Cell 3 is 8' × 18' and held 12 men; Cell 4 is 10' × 20' and held 16 men; Cell 5 is 8' × 18' and held 12 men; Cell 6 is 20' × 25' and held 34 men.

Next, plaintiffs state that only Cell 1 has its own toilet, sink, and shower, and that the detainees assigned to the other cells must share a common bathroom. This bathroom has four showers, five toilets, and two urinals. Plaintiffs allege that during the period of their detainment, however, two of the showers, two of the toilets, and one of the urinals did not function. Additionally, the toilets are positioned close together, without partitions, such that plaintiffs lack sufficient privacy when using these facilities. Plaintiffs also contend that the sinks and toilets leak, there are missing tiles in the shower room, and bare wires are exposed in a wall by the exit from the bathroom. They argue these conditions create great safety hazards. Furthermore, plaintiffs allege their cells are locked overnight and the correctional officers on duty to let detainees out to use the bathroom often fall asleep. As a result, plaintiffs claim they have been forced to urinate in soda cans and plastic bags, or to wait uncomfortably until the morning.

Third, plaintiffs allege they have spent several days and nights in the pre-trial building without heat, where temperatures ranged from 30 to 50 degrees. When plaintiffs complained, they were told that the boiler was malfunctioning. This condition also caused an absence of hot water at the sinks and showers. Plaintiffs complain that when they have coats, they are not allowed to wear them in the dining hall.

Fourth, plaintiffs contend there is a lack of ventilation in the building. The air exchanger is not used, and plaintiffs allege they are subject to the cigarette smoke, germs, and "offensive body odors and gasses of other detainees." They also allege that the noise level in the building created by over 100 inmates and six television sets functioning at once is excessive.

Finally, plaintiffs allege there are no chairs to sit in or tables to write on in the building; they are forced to use their bunks or the floor. They claim that their bunk beds have no ladders and they are at risk of serious injury when they climb up the bars to get into their beds. Plaintiffs also allege they are not given writing materials during their detention.

In their brief in support of their motion for summary judgment, defendants allege the pre-trial building at SCI contains three cells on both sides of a central corridor which leads to a common bathroom and "great room," used as a dining and social hall. Cell 1 is reserved for inmates who demonstrate particular behavioral problems during arrest. According to defendants, none of the plaintiffs were ever confined in Cell 1.

Defendants allege the total area of the pre-trial building is 3,655 square feet, and the average prison population is 85 inmates, such that there is approximately 40 to 45 square feet of space per inmate in the building. However, the building capacity is 110 inmates, and at this population, there would be approximately 30 to 35 square feet of space per inmate. Defendants' calculations presumably include the area in Cell 1 and the common bathroom. Defendants also allege that the doors to Cells 2–6 are open for approximately 16 hours each day, and the inmates are taken outside for recreation for two hours a day.

Defendants contend that the maintenance needs of the pre-trial building are given first priority, and every attempt is made to promptly repair any problems. They allege that many of the broken facilities are a result of deliberate actions by the inmates.

Defendants deny the allegation that the pre-trial building has ever been without heat for a significant length of time. They assert that the failure of the heating system in the winter would constitute an emergency, and that on the occasions where the boiler broke down, repairs were made and heat was restored promptly. Defendants state that inmates are not allowed to wear coats in the dining hall for security reasons, including to prevent smuggling.

As to ventilation, defendants admit the air exchanger is not frequently used because of the noise it generates, and allege that exhaust fans are run constantly instead. They deny there is a problem with smoke in the building, because smoking is not allowed in State buildings.

Finally, defendants deny that no tables or chairs are provided for the inmates. They allege these facilities exist in the great room, and assert that most inmates prefer to stay in their cells and use their locker boxes as tables. Defendants further allege that paper and writing utensils are provided to inmates on a regular basis.

### B. *Claim Two: Inadequate Access to the Courts*

In claim two, plaintiffs contend defendants have violated their constitutional right of access to the courts by failing to afford them adequate use of the prison law library. Plaintiffs state they are scheduled to receive one hour per day in the library; however, they allege the library is often closed, and as a result, their use has been reduced to only two to three hours per week. Plaintiffs allege that this time is insufficient to prepare for unspecified litigation they had in several state and federal courts.

Plaintiffs further allege defendants unconstitutionally denied them access to resources such as the photocopier. Plaintiffs assert they are not allowed to copy case law, court rules, and other documents on the prison library photocopy machine. Instead, they are told to copy the necessary portions from the books using pens and paper.

Defendants respond that pre-trial detainees are allowed one hour per day in the law library and state that when more inmates sign up for library time than there are slots available, priority is given to inmates who can demonstrate an approaching court deadline or who were not previously afforded access that week. Defendants also contend that the library has a photocopier used to copy material for inmates; however, inmates may not make the copies themselves, but must have them made by a paralegal.

### C. *Claim Three: Lack of Grievance Procedure*

In claim three, plaintiffs allege "there are no active grievance procedures" for the SCI pre-trial building. They state a grievance box exists in the building and contend that the grievance forms placed in the box are collected every 2–3 weeks, but no action is taken on them. Plaintiff Hoover alleges he filed grievances regarding each of the issues raised before this court, none of which was answered. Furthermore, plaintiffs allege that for several months during 1993, SCI lacked a specified grievance officer because the original officer was moved to another administrative position. Finally, plaintiffs assert that when they inquired as to the identity of the new grievance officer, no one would give them an answer.

In response, defendants contend the prison grievance procedure is adequate. They allege that grievances are collected from the grievance box on a daily basis, but that due to the large number of complaints filed, it may take several weeks to investigate a matter and reply to the inmate.

In their complaint, plaintiffs also claim that the person who collects the grievance forms apprises the correctional officers that plaintiffs have filed a grievance against them. Plaintiffs allege that as a result, they are retaliated against with "unexplainable institutional 'write-ups.'" However, in their complaint and affidavits, plaintiffs do not provide specific examples of this alleged retaliation for filing a grievance. Hoover does allege he was retaliated against by a correctional officer for signing as a witness on a grievance form. He states he saw Officer Oettles assault another pre-trial detainee, and he put his name down as a witness on that detainee's grievance form. Hoover alleges that one month later, while preparing to go to Superior Court on pending criminal charges, Officer Oettles told him he had "a big mouth." Oettles then apparently dumped Hoover's legal documents out of their folders and told Hoover to put them back while he was in handcuffs. In response, Hoover states he called Officer Oettles "ignorant." Hoover also admits he had cigarettes in his possession at that time. Oettles wrote up a disciplinary

report on Hoover for having contraband and for threatening and disorderly conduct.

### D. *Claim Four: Lack of Proper Classification*

In claim four, plaintiffs claim that their constitutional rights have been violated by several of defendants' classification and housing policies. First, plaintiffs allege that once prisoners are sentenced, they remain in the SCI pre-trial building for up to one month. As a result, plaintiffs have been housed with sentenced prisoners while they were still pre-trial detainees. They allege this exposes them to psychological pressures and physical threats. Furthermore, plaintiffs Hoover and Ducote contend that once they were sentenced, they were not immediately transferred out of the pre-trial building and thus remained with pre-trial detainees. They allege that pre-trial detainees are "more restless and wanton in their behavior" because they are less concerned with the consequences that result from disobeying institution rules. Plaintiffs claim that being housed with these detainees after plaintiffs have been sentenced affects their ability to behave and avoid "institutional infractions." Apparently, as sentenced inmates, Hoover and Ducote do not reflect the general pre-trial detainee personality trait of a tendency toward "restless and wanton" behavior.

Defendants, through the Kearney affidavit, state that once an inmate is sentenced, he may remain in the pre-trial building for two to three weeks while he is classified in accordance with his security risk, and a spot is found for him in an appropriate institution.

Second, plaintiffs Hoover and Cephas allege they have been placed in the Administrative Segregation and Detention Area ("ASDA") for periods of time to serve disciplinary sanctions. While in the ASDA, these plaintiffs contend they were housed with "chronically ill mental patients," who were disorderly and disturbed Hoover's sleep. Cephas alleges he was assaulted by a mentally ill inmate while he was "enjoying outside recreation." Hoover also complains about the conditions in the ASDA, stating that the cells are too crowded, there is no ventilation in Cell 1, the meals are too small, and he is prevented from engaging in "meaningful exercise." Defendants deny that mentally or chronically ill inmates are assigned to the ASDA.

Lastly, plaintiffs allege they are housed with inmates who have AIDS and tuberculosis, and are not notified of the results of the tests that indicate the inmates have these diseases. Plaintiffs allege that one inmate who told plaintiffs he had AIDS would use pieces of toilet paper to stop some bleeding on his tongue, and then would leave the paper on the cell floor. Plaintiffs further allege they are at risk of contracting AIDS because they use the same phone, bathroom facilities, water fountains, and meal trays as the inmates with this disease.

Defendants respond that inmates with infectious diseases are not automatically segregated from the rest of the inmates. Rather, they are confined to the medical department if the medical personnel determine that their condition poses a danger to the health of the other inmates. Furthermore, defendants assert that all medical conditions are kept confidential in consideration of an inmate's privacy.

### E. *Claim Five: Pre–Trial Disciplinary Procedures*

Finally, in claim five, plaintiffs allege they are wrongfully subject to the same disciplinary rules and sanctions as sentenced prisoners. Plaintiffs assert the Delaware Constitution dictates that pre-trial detainees shall not receive the same disciplinary sanctions as sentenced prisoners. In addition, Hoover states that he was subject to several disciplinary hearings which lacked due process. As a result, he received the following sanctions, which he alleges were too harsh: 10 days isolation for possessing a book of matches found to be dangerous contraband; 90 days isolation for possessing contraband used for tattooing and for tampering with evidence; 5 days isolation for threatening and disorderly conduct; 5 days loss of privileges for possessing cigarettes and matches; and 10 days isolation for possessing a piece of metal found to be dangerous contraband.

In response, defendants rely on the Kearney affidavit which states that plaintiffs are provided with due process in all disciplinary matters. They also argue that all inmates are subject to the prison rules.

## DISCUSSION

Plaintiffs have raised claims for relief which are based on alleged violations of their due process rights and right of access to the courts. For the following reasons, the court will grant a summary judgment in favor of defendants as to all the claims in plaintiffs' complaint.

Federal Rule of Civil Procedure 56(c) authorizes a court to grant a summary judgment if it finds "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." A genuine issue of material fact arises only if a reasonable jury could find for the nonmoving party on that fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). For purposes of resolving this motion, the court must consider all facts alleged by plaintiffs to be true.

### I. *Plaintiffs' Rights to Due Process*

#### A. *Conditions of Confinement*

■ Plaintiffs first challenge the conditions of their confinement in the SCI pretrial building, claiming they are unsafe and unhealthy. Because plaintiffs are pre-trial detainees, their claims are governed by the Due Process Clause, rather than the Eighth Amendment. *Boring v. Kozakiewicz*, 833 F.2d 468, 471 (3d Cir.1987) ("Pretrial detainees are not within the ambit of the Eighth Amendment, but are entitled to the protections of the Due Process clause."), *cert. denied*, 485 U.S. 991, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988). However, the Third Circuit has held that the standard set out by the Supreme Court in *Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), for analyzing violations of the Eighth Amendment based on conditions of confinement also applies to pre-trial detainees through the Due Process Clause. *Kost v. Kozakiewicz*, 1 F.3d 176, 188 (3d Cir.1993); *see also Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir.1994) (applying the *Wilson* standard to pretrial detainees).

■ Under *Wilson*, 501 U.S. at 298, 303, 111 S.Ct. at 2324, 2326–27, in order to establish a constitutional violation based on the conditions of their confinement, plaintiffs must prove that defendants acted with deliberate indifference to deprive them of "the minimal civilized measure of life's necessities." The Court further elaborated on this standard, stating that a constitutional violation will be found only when the conditions of confinement "have a mutually enforcing effect that produces the deprivation of a single identifiable human need such as food, warmth, or exercise," and that "[n]othing so amorphous as 'overall conditions' can rise to the level of [such a violation] when no specific deprivation of a single human need exists." *Id.* at 303–04, 111 S.Ct. at 2327.

■ While plaintiffs may not be as comfortable in their cells at the SCI pre-trial detention building as they would like, they have not alleged facts from which a reasonable fact-finder could conclude that they have been deprived of "identifiable human needs." *See Sellers v. Henman*, 41 F.3d 1100, 1102 (7th Cir.1994) (finding that an inmate's challenge to his conditions of confinement based on a small cell, too little exercise, and lack of an extra mattress "plainly have no merit in light of the realities of prison administration and previous decisions"). Despite crowded conditions, plaintiffs have not shown that they have been denied shelter, beds, food, or warmth. They allege that on several occasions they spent a day or night without heat and hot water. However, plaintiffs themselves attribute these problems to a malfunctioning boiler which defendants presumably repair on each occasion. Thus, plaintiffs have not demonstrated that defendants have acted with deliberate indifference to this problem.

■ As to plaintiffs' other claims concerning such issues as broken bathroom facilities, ventilation and odor problems, the noise level from too many television sets, and the lack of chairs, tables, and ladders for their beds, the court finds these problems constitute "amorphous conditions" which do not indicate the

deprivation of a particular human need. *See Wilson v. Schomig,* 863 F.Supp. 789, 795 (N.D.Ill.1994) (finding the conditions of inmate's confinement "not sufficiently serious to violate" the Constitution); *Veteto v. Miller,* 829 F.Supp. 1486, 1495–96 (M.D.Pa.1992) (finding that the "admittedly uncomfortable conditions nebulously outlined" by the plaintiff did not rise to the level of an Eighth Amendment violation); *Payton v. Vaughn,* 798 F.Supp. 258, 260–61 (E.D.Pa.1992) (holding that the conditions alleged by the plaintiff did not "amount to any[thing] more than unpleasantness," which is not sufficient to state a cognizable constitutional claim). Consequently, the court will grant defendants' motion for summary judgment as to all the issues in claim one of plaintiffs' complaint.

### B. *Classification Within the SCI Pre–Trial Building*

In addition to challenging the general conditions of their confinement, plaintiffs also raise a claim based on the location of their housing within the SCI pre-trial building. In claim four, plaintiffs allege their constitutional rights are violated by defendants' practices of housing plaintiffs with sentenced inmates, of placing plaintiffs in the ASDA, and of housing them with "chronically ill mental patients," and with inmates suffering from AIDS and tuberculosis. As the court previously noted, plaintiffs appear to be claiming that their rights are violated *both* when, as pre-trial detainees, they are housed with sentenced inmates and when, as sentenced inmates, they are housed with detainees.

■ As to these claims, the court can find no authority, either in the Constitution or in Delaware state law, to support the assertion that pre-trial detainees who are being lawfully held pending a trial have a liberty interest in being housed separately from sentenced inmates. *See Epps v. Levine,* 457 F.Supp. 561, 564 (D.Md.1978) (finding that a pretrial detainee had no liberty interest stemming from federal law in being confined to a certain institution); *see, e.g., Hewitt v. Helms,* 459 U.S. 460, 468–69, 103 S.Ct. 864, 870, 74 L.Ed.2d 675 (1983) (holding that prisoners have no protected liberty interest in being confined at a certain security level); *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976) (holding that the transfer of an inmate from one institution to another does not implicate due process); *Saunders v. Watson,* 1990 U.S. Dist. LEXIS, No. 88–519 (D.Del. Jan. 25, 1990) (Report and Recommendation) *adopted,* 1990 U.S. Dist. LEXIS 20248 (D.Del. June 6, 1990) (finding the state of Delaware has created no liberty interest in a prisoner's classification in its statutes or regulations which govern classification determinations); *Brown v. Cunningham,* 730 F.Supp. 612, 614–15 (D.Del.1990) (holding that an inmate has no liberty interest in being free from administrative segregation under Delaware law or administrative regulations).

■ In addition, the weight of the authorities seems to hold that the failure to segregate an AIDS-infected prisoner from the general population fails to rise to the level of a constitutional violation. *Goss v. Sullivan,* 839 F.Supp. 1532, 1536 (D.Wyo. 1993) (citing cases). Thus with regard to whether housing plaintiffs with inmates who have AIDS constitutes an impermissible condition of their confinement, the relevant inquiry is whether defendants have acted with deliberate indifference to plaintiffs' health or safety, so as to deprive them of an identifiable human need. *See Farmer v. Brennan,* — U.S. —, —, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994); *Wilson,* 501 U.S. at 303, 111 S.Ct. at 2326.

The court finds plaintiffs have not met this standard. Plaintiffs have only alleged specific contact with one inmate who has AIDS, and this contact consists of being present while the inmate treated a wound on his tongue and using the same facilities as this inmate. Plaintiffs clearly have not demonstrated this inmate poses a serious and substantial risk to their health or safety, nor have they alleged facts to show deliberate indifference to such a risk by defendants. Furthermore, the risk plaintiffs allegedly suffer through general contact with other AIDS-infected inmates, including using the same phone, bathroom facilities, water fountains, and meal trays, "is based on unsubstantiated fears and ignorance." *See Glick v.*

*Henderson*, 855 F.2d 536, 539 (8th Cir.1988) (holding "the transference of AIDS through [similar] means is simply too remote to provide the proper basis" for a constitutional claim); *Goss*, 839 F.Supp. at 1537 (finding plaintiff's claims based only on "generalized fear of contracting AIDS"). This court refuses to permit constitutional recognition of such "unsubstantiated fears unrecognized by the mainstream medical community." *Glick*, 855 F.2d at 540.

■ Similarly, plaintiffs have alleged no facts that would demonstrate a substantial risk to their health or safety or the deprivation of a basic human need resulting from their being housed with sentenced inmates, with mentally ill patients, or with inmates who have tuberculosis. Cephas claims that he was assaulted by a mentally ill inmate while outside during recreation time. However, he does not allege that defendants had any advance knowledge that the assault would occur, nor that they acted with deliberate indifference to the risk that he might suffer serious harm.

■ Finally plaintiffs contend that defendants' practice of placing them in the ASDA to serve disciplinary sanctions violates the Due Process Clause. To analyze a claim regarding a restriction placed on a pre-trial detainee, a court "must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell v. Wolfish*, 441 U.S. 520, 538, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979). Absent a showing of express intent to punish, "whether ... restrictions and practices constitute punishment in the constitutional sense depends on whether they are rationally related to a legitimate nonpunitive governmental purpose and whether they appear excessive in relation to that purpose." *Id.* at 561, 99 S.Ct. at 1886.

Plaintiffs do not contend that they are put in the ASDA as punishment for the crimes for which they were arrested, but rather, to serve sanctions imposed because they violated prison rules. It is clear that, in addition to the essential objective of insuring the detainee's presence at trial, the government has legitimate interests which stem from its need to maintain institutional security and order and "to manage the facility in which the individual is detained." *Bell*, 441 U.S. at 540, 99 S.Ct. at 1874; *see also Union County Jail Inmates v. Di Buono*, 713 F.2d 984, 993 (3d Cir.1983) ("It is plain that there is a legitimate governmental interest in effective management of a detention facility."), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984). Furthermore, the placement of inmates within the prison system is among the "wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." *Meachum*, 427 U.S. at 225, 96 S.Ct. at 2538.

The court finds that placing plaintiffs in the ASDA to serve disciplinary sanctions is reasonably related to the legitimate, nonpunitive government interest of managing the detention facility and maintaining security and order. In addition, plaintiffs have alleged no facts to suggest that defendants' practices are excessive with respect to those interests. Although the conditions in the ASDA as Hoover has alleged them may be less than desirable, they do not violate his due process rights under *Wilson*. The court can discern no constitutional violations in any of defendants' classification or housing practices challenged by plaintiffs. Consequently, the court will grant a summary judgment in favor of the defendants as to all of plaintiffs' classification issues.

### C. *Grievance System*

■ In claim three of their complaint, plaintiffs appear to raise a due process claim based on the inadequacy of the prison grievance system. However, inmates "do not have a constitutionally protected right to a grievance procedure." *Brown v. Dodson*, 863 F.Supp. 284, 285 (W.D.Va.1994) (citing *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991)); *Spencer v. Moore*, 638 F.Supp. 315, 316 (E.D.Mo.1986) (holding that "an inmate grievance procedure is not constitutionally required"). Furthermore, "a state grievance procedure does not confer any substantive constitutional right upon prison inmates." *Brown*, 863 F.Supp. at 285. Thus, "[i]f the state elects to provide a grievance mecha-

nism, violations of its procedures do not ... give rise to a § 1983 claim." *Spencer*, 683 F.Supp. at 316; *see also Mann v. Adams*, 855 F.2d 639, 640 (9th Cir.), *cert. denied*, 488 U.S. 898, 109 S.Ct. 242, 102 L.Ed.2d 231 (1988). This is also because a prisoner's constitutional right to petition the government for redress of grievances is the right of access to the courts, "which is not compromised by the prison's refusal to entertain his grievance." *Flick*, 932 F.2d at 729.

▮ Also in claim three, plaintiff Hoover appears to assert that a correctional officer violated his constitutional rights by giving him a disciplinary write-up in retaliation for Hoover being listed as a witness against the officer on a prison grievance form. To the extent that Hoover attempts to raise a claim of retaliation, he alleges no facts that would demonstrate personal involvement on the part of any defendants in this case. Consequently, the court will grant defendants' motion for a summary judgment on all the issues in plaintiffs' third claim.

### D. *Disciplinary System*

▮ Finally, in claim five, plaintiffs challenge defendants' practice of subjecting them (as pre-trial detainees) to the same prison disciplinary process used for sentenced prisoners. Applying the same rules and sanctions to sentenced prisoners and pre-trial detainees, however, does not itself present a cognizable constitutional violation, as long as the disciplinary process is "rationally related to a legitimate nonpunitive governmental purpose" and is not "excessive in relation to that purpose." *Bell*, 441 U.S. at 561, 99 S.Ct. at 1886. The Delaware Constitution provides nothing to the contrary. As the court has stated above, the maintenance of institutional security and order is clearly a legitimate governmental purpose. Furthermore, the court finds plaintiffs have not demonstrated in their complaint and affidavits that the SCI disciplinary process is excessive with regard to that goal.

With further regard to the SCI disciplinary process, Hoover alleges he was subject to several hearings which lacked due process and consequently was "harshly sanctioned." Upon examining his claim, it would appear that Hoover's underlying complaint is really with the sanctions he was given, which he contends were disproportionately severe for conduct he believes should not be against prison rules. For example, rather than the period of isolation he received for possessing tattooing contraband and tampering with evidence, Hoover argues that, "at most [he] should have been written a charge (minor write-up) for nondangerous contraband."

▮ However, as plaintiffs have failed to show that the entire SCI disciplinary system is unconstitutional, the only remaining inquiry is whether the disciplinary hearings of which Hoover complains lacked due process. This court has previously questioned whether the classification of Delaware inmates within the prison system requires due process protection. *See Blizzard v. Hastings*, 886 F.Supp. 405, 408–09 (D.Del.1995). Even if the court assumes that some process is due to a prisoner upon reclassification, clearly it "amounts to no more than notice of the charges against him and an opportunity to present his views to the prison officials." *Id.* at 409 (citing *Fridge v. Dixon*, Civil Action No. 83–193–LON (D.Del. Jan. 30, 1985) at 11). Hoover has alleged no facts to support the conclusion that he did not receive this requisite due process. Consequently, the court will grant a summary judgment in favor of defendants on all the issues in claim five of plaintiffs' complaint.

### II. *Plaintiffs' Right of Access to the Courts*

Finally, in claim two, plaintiffs argue that the limitations placed on their use of the prison law library violate their right of access to the courts. Plaintiffs assert they are only scheduled to have one hour per day in the library, and that they usually are given only two to three hours per week of that time.

▮ While the Constitution guarantees prisoners access to an adequate law library, *see Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977), that access is not unqualified. Courts have recognized that "[p]rison officials of necessity must regulate the time, manner, and place in which library facilities are used." *Lindquist*

**420**

*v. Idaho State Bd. of Corrections,* 776 F.2d 851, 858 (9th Cir.1985). The key is that "such access cannot become so attenuated as to become meaningless." *Cepulonis v. Fair,* 732 F.2d 1, 4 (1st Cir.1984). Plaintiffs clearly have not demonstrated that the two to three hours per week of library time they are afforded is access which can called "meaningless."

 Plaintiffs further allege a constitutional violation based on restrictions of their access to the photocopier. This claim implicates resources that are peripheral and not central "to the right of access to the courts that *Bounds* protects." *Peterkin v. Jeffes,* 855 F.2d 1021, 1041 (3d Cir.1988); *see also Kershner v. Mazurkiewicz,* 670 F.2d 440 (3d Cir.1982) ("Pads, pens, pencils and photocopy machines are neither 'law libraries' nor 'alternative sources of legal knowledge,' ") In such cases, the Third Circuit has held that plaintiffs must show some actual injury resulted from defendants' actions; that is, an "instance in which [the] inmate was actually denied access to the courts." *Hudson v. Robinson,* 678 F.2d 462, 466 (3d Cir.1982).

The court finds that plaintiffs have failed to allege facts that would demonstrate any actual injury stemming from their lack of access to the photocopier. For example, they have identified no specific examples of any prejudice they suffered as a result of not having a photocopy, and their ability to proceed in this lawsuit or to file new ones does not appear to be impeded. Consequently, plaintiffs have failed to show defendants unconstitutionally abridged their right of access to the courts and the court will grant defendants' motion for a summary judgment on this claim.

*CONCLUSION*

For the above reasons, the court will grant a summary judgment in favor of the defendants and against the plaintiffs on all the claims in plaintiffs' complaint. The court will issue an Order in accordance with this Memorandum Opinion.