**Debro Siddiq ABDUL–AKBAR, Plaintiff,**

v.

**DEPARTMENT OF CORRECTIONS, Rick Kearney, Avery Bowen, George Truitt, Sara McGee, David Elliot, Officer Mumford, Angus MacLennan, Karen Washington–Hall, David Andrews, Diane Ranger, and All Persons Acting in Concert With Them, Defendants.**

**No. 95–801–RRM.**

United States District Court, D. Delaware.

Dec. 19, 1995.

■■■■■

---

Debro Siddiq Abdul–Akbar, pro se.

McKELVIE, District Judge.

This is a civil rights case. Plaintiff is incarcerated at Sussex Correctional Institution ("SCI") located in Georgetown, Delaware. Defendants are various prison officials within the Delaware Department of Corrections ("DOC"). Plaintiff has filed multiple complaints under 42 U.S.C. § 1983. Each is accompanied by a petition for leave to proceed *in forma pauperis.*

In plaintiff's complaints, he alleges that defendants have violated his rights under the First, Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. In addition, he alleges that defendants have violated certain federal and state laws. Because plaintiff's complaints contain similar legal and factual claims, and because plaintiff names the same defendants in a number of his complaints, the court will treat plaintiff's numerous submissions as a single complaint under § 1983 and a single petition for leave to proceed *in forma pauperis.* This is the court's decision on plaintiff's complaint and petition.

I. *FACTUAL AND PROCEDURAL BACKGROUND*

On November 17, 1994, the court received plaintiff's first complaint. This first complaint names Karen Washington–Hall as defendant. Defendant Washington–Hall appears to be a counselor of the "Key Program," which is a drug abuse treatment and rehabilitation program operated by the DOC.

On November 30, 1994, the court received plaintiff's second complaint. This second complaint names Abdul–Akbar and "all similarly situated prisoners" as plaintiffs. The complaint names the DOC and Rick Kearney as defendants. Defendant Kearney appears to be the Warden at SCI. On January 11, 1995, the court received what appears to be an amendment to the second complaint.

On February 13, 1995, the court received plaintiff's third complaint and a "petition for a subpoena duces tecum." This third complaint names George Truitt, Sara McGee, and Rick Kearney as defendants. Defendants Truitt and McGee appear to be correctional officers at SCI. On February 17, 1995, the court received a "Motion for Immediate Injunctive Relief and Restraining Order" that appears to relate to this third complaint. The court will construe the petition and the motion as amendments to plaintiff's third complaint because these documents contain

additional allegations related to the same facts.

On March 27, 1995, the court received plaintiff's fourth complaint. This fourth complaint names David Elliot, Rick Kearney, Avery Bowen, and one Officer Mumford as defendants. Defendants Elliot and Mumford appear to be correctional officers at SCI. Defendant Bowen appears to be the Deputy Warden at SCI.

On May 4, 1995, the court received plaintiff's fifth complaint. This fifth complaint names Angus MacLennan, Rick Kearney, and "all persons acting in concert with them" as defendants. Defendant MacLennan appears to be a counselor at SCI.

On August 17, 1995, the court received plaintiff's sixth complaint. This sixth complaint names David Andrews and Diane Ranger as defendants. Defendant Andrews appears to be a law library aid at SCI. Defendant Ranger appears to be a paralegal at SCI.

On October 16, 1995, the court received a request from plaintiff that the court recuse itself from all of plaintiff's cases "due to the fact that [the court] is using [its] personal feelings to judge [plaintiff] instead of the law." In support of this contention, plaintiff alleges that the court has unreasonably delayed the disposition of his complaints.

### A. *The First Complaint*

Plaintiff alleges that defendant Washington–Hall allowed relatives and friends into the Key Program while she denied plaintiff admission into the program. In a letter submitted along with plaintiff's complaint, Washington–Hall states that plaintiff was denied admission to the program because he did not meet the criteria for admission. Apparently, plaintiff's sentence did not "fall within the prescribed time frame" established for admission into the program. She also states that the program sometimes makes exceptions to the criteria for admission but that, at the time plaintiff applied, the program was "at capacity." She encouraged plaintiff to reapply for admission after 12 months had passed.

Plaintiff claims that Washington–Halls's alleged admission of friends and relatives into the Key Program while denying him admission violated his right to Equal Protection. He also claims that her actions constituted illegal racketeering. He apparently further claims that her refusal to allow him into the Key Program violates his right to Due Process because prisoners have a right under state law to "treatment and rehabilitation." Finally, he claims that Washington–Hall abused her discretion by denying him admission into the Key Program.

Plaintiff seeks a declaratory judgment that Washington–Hall's actions violated plaintiff's constitutional rights. He also seeks injunctive relief "barring defendant or anyone acting in concert with her from all forms of retaliation and from carrying out illegal practices," "stopping the defendant from barring [plaintiff] from treatment," and "granting [plaintiff] admittance in [the] program." He seeks compensatory damages in the amount of $1 million and punitive damages in the amount of $3 million. Finally, he seeks counseling for emotional stress, appointment of counsel, compensation of expenses, and "[a]ny and all actions deemed appropriate."

### B. *The Second Complaint*

Plaintiff alleges that prison overcrowdedness has caused a number of problems at SCI. Prisoners are idle, stealing occurs more frequently, and stress and tension has increased. In addition, privacy has decreased, medical care has slowed, prisoners are sleeping on the floor, and people are housed together without considerations of compatibility. Plaintiff states that he has had to wait over 3 months for a hernia operation because SCI officials told him that other prisoners have more serious medical needs. In addition, he claims that he and 100 other prisoners are living in dormitories originally designed for about 20 prisoners, although he states later in the same document that 44 prisoners are living in that space. Apparently, plaintiff was later transferred to the Administrative Segregation and Detention Area ("ASDA"), where he alleges that 10 prisoners live in a space designed for 3.

Plaintiff further alleges that "earned good-time credits are not accessible to the majority of prisoners" because the DOC discriminates against "writ writers," who apparently are prisoners that make a substantial number of complaints about prison officials. Specifically, he claims that defendants select certain prisoners to be facilitators for prison programs, such as "Alternative to V[iole]nce," "Parenting," "Pre Release," "T.E.M.P.O.," "Computer Classes," and "Reshape and Lifer's Group," and that defendants allow these facilitators to select the participants of these programs. He alleges that these facilitators, with defendants' consent, deliberately refuse to select "writ writers." Apparently, prisoners can earn "good-time credits" through participation in these programs.

Plaintiff makes a number of additional claims. He alleges that his use of the law library has been restricted to 1 hour per day, 4 days a week. He alleges that the DOC has failed in its responsibility to provide rehabilitation to prisoners, including himself. Finally, he alleges that the noise level in the dormitory is too high.

Plaintiff's amendment to his second complaint alleges that various correctional officials at SCI have "started a system of retaliation and abuse against plaintiff for exercising his Federally Protected Constitutional Rights." He claims that in October, 1994, he sent some papers to an unspecified United States Court of Appeals. He further claims that the court dismissed his case for failing to receive the papers. He claims that on or about November 18, 1994, correctional officer Brenda Bursure (whom plaintiff does not name as a defendant) caused a package addressed to plaintiff to be returned to sender without notification to him as required by prison regulations. He claims that on or about December 28, 1994, he was screened for drugs because an informant "lied outright" about plaintiff smoking marijuana. Moreover, he claims that the drug screening was not random as is required by DOC regulations. He claims that on or about December 29, 1994, he was transferred to a medium security tier ("A Tier") that is allegedly used for prisoners that the staff members "don't

like." He claims that residents of A Tier are denied jobs and other training; however, in an attached letter he states that 10 of the 48 residents are "actively involved in programs and educational classes." He claims that on January 4, 1995, correctional officer Frank O'Day (whom plaintiff does not name as a defendant) gave him a loaf of bread and then had another officer "write [him] up for it." Finally, he claims that on January 5, 1995, correctional officer Howard Fisher (whom plaintiff does not name as a defendant) transferred him to the ASDA and told him that he would "never get anything but hell if [he] didn't stop filing suits and complaints."

Plaintiff apparently claims that the conditions of confinement and access to medical care at SCI constitute Cruel and Unusual Punishment. He also claims that the library restrictions and the prison officials' allegedly retaliatory actions violate his right of access to the courts. Finally, he claims that the prison officials' alleged creation and maintenance of a discriminatory system of selecting prisoners for program participation and awarding "good-time credits" violates his rights to Due Process and Equal Protection.

Plaintiff seeks a declaratory judgment, temporary restraining order, class certification, appointment of counsel, a jury trial, and attorney fees. He also seeks compensatory damages in the amount of $12 million and punitive damages in the amount of $11 million.

## C. *The Third Complaint*

Plaintiff alleges that on or about January 7, 1995, defendant Truitt held a disciplinary hearing for plaintiff. Plaintiff states that Truitt asked him if he had anything to say about the incidents that were the subject of the hearing. Plaintiff states that he "gave [his] side of the story." Plaintiff alleges that he asked Truitt if he could call a representative, confront his accuser, call witnesses on his behalf, and examine written incident reports. He alleges that Truitt denied his requests without explanation. Plaintiff states that he was found "guilty" at the disciplinary hearing, although plaintiff does not state the nature of the infractions. It appears, however, that these disciplinary re-

ports are the ones to which plaintiff refers in his fifth complaint. If so, the plaintiff received two disciplinary reports for failing to obey an order and one report for theft.

Plaintiff further alleges that defendant McGee found plaintiff "guilty" of a third instance of failing to obey an order based on a fourth incident report. According to the "Appeal Notice" forms that plaintiff attached to his complaint, this fourth incident occurred about a month after the January 7, 1995 hearing, although plaintiff appears to imply that it occurred at the same time as the earlier hearing. It also appears from these Appeal Notices that Truitt was the officer who held the disciplinary hearing. Plaintiff claims that he was not present when the final decision was made by McGee. It appears from the relevant Appeal Notice that he was removed from the disciplinary hearing because of his disruptive behavior.

Plaintiff alleges that he appealed the results of these hearings. He states that SCI regulations require the Warden to hear disciplinary appeals; however, Deputy Warden Avery Bowen apparently ruled on his appeals. In addition, he claims that he was given a sanction of isolation for 150 days, which he claims is "the longest in Delaware history." The attached "Appeal Notice" forms appear to indicate that plaintiff received 150 total days in isolation, including 15 days for one infraction, 30 days for a second, 45 days for a third, and 60 days for a fourth. However, according to the documents, the 60–day isolation sanction was given on February 8, 1995, not on January 7, 1995, as plaintiff implies in his complaint.

Plaintiff's final allegation is that defendant Kearney allows greater disciplinary sanctions at SCI than wardens allow at other prisons in Delaware. Plaintiff apparently claims that defendant Kearney is not following DOC regulations in this regard.

Plaintiff claims that the actions of defendants Truitt and McGee during his disciplinary hearings denied his right to Due Process. He also claims that defendant Kearney's allowance of greater sanctions violated his right to Equal Protection. He further claims that the sanctions were imposed as a retaliatory measure in violation of his right of ac-

cess to the courts. Finally, his complaint could be read to state a claim that the sanctions imposed on plaintiff constitute Cruel and Unusual Punishment.

Plaintiff seeks a declaratory judgment, injunctive relief, a restraining order, and a jury trial. He also seeks compensatory damages in the amount of $10,000 and punitive damages in the amount of $20,000. Finally, he seeks appointment of counsel, attorney fees, and "[a]ny and all relief possible."

## D. *The Fourth Complaint*

On March 3, 1995, plaintiff was returning from a Muslim service that apparently was outside the prison. He alleges that defendant Elliot ordered defendant Mumford to perform a body cavity search of plaintiff and that Mumford performed the search. He also alleges that during the search Mumford refused to address him by his Muslim name "purposefully and with express intent to insult and religiously [persecute him]." He appears to allege that other prisoners returning from outside visits do not receive body cavity searches. He has attached "affidavits" by other prisoners to support this assertion.

Plaintiff alleges that Elliot then told him, "[you] are confined to [your] cell because [you] are a Black Muslim and alway[]s suing people." However, plaintiff has attached a disciplinary report stating that he was sanctioned because he "fail[ed] to obey an order" to submit to the rectal exam. Although he does not state the actual sanction he received, he challenges the general authority of the DOC to give a sanction of 90 days isolation. Plaintiff admits that defendants let him out of isolation every 15 days, but he alleges that this is to hide their illegal sanction.

Plaintiff lists two additional claims. He alleges that Kearney and Bowen fail to follow the Delaware prison policy of listing privileges lost when a prisoner is given a sanction. He also alleges that his meals are transported on an unsanitary cart and are cold by the time he gets them.

Plaintiff apparently claims that defendant Mumford's failure to address plaintiff by his

Muslim name discriminates against him on the basis of religion. He apparently claims that the body cavity search violated his rights under the Fourth Amendment and the Equal Protection Clause. Furthermore, he apparently contends that the body cavity search, the food service, and the possibility of a 90–day isolation sanction constitute Cruel and Unusual Punishment. Finally, he claims that defendants performed the body cavity search and sanctioned him in retaliation for his filing of lawsuits against defendants, all in violation of his right of access to the courts.

Plaintiff does not request any specific relief in this complaint.

### E. *The Fifth Complaint*

Plaintiff lists a number of events that he interprets as retaliation against him for filing lawsuits and complaints against prison officials. He claims that these events confirm that a conspiracy exists among defendants to retaliate against him.

On January 4, 1995, plaintiff was the subject of two disciplinary reports for theft and failure to obey an order. Plaintiff claims that one of the reports incorrectly charged him with a more serious "Class I" infraction, "Failing to Abide by Sanction," rather than the appropriate "Class II" infraction, "Failure to Obey an Order." On January 5, 1995, plaintiff was transferred to the ASDA for "threatening behavior." Apparently, plaintiff became "loud and disorderly" when a correctional officer refused to provide plaintiff with his "snack" as ordered by a doctor. Plaintiff also alleges that his prayer cap ("Kufi") and sweatshirt were confiscated when he was transferred to the ASDA, although plaintiff apparently owns four Kufis. Plaintiff was also fired from his prison job.

Plaintiff alleges that defendants were trying to transfer him to another institution because SCI allegedly has transferred every other "writ writer." He alleges that because defendants could not transfer him, he has been classified as "maximum security" for his filing of complaint and lawsuits. He also alleges that he requested removal from the maximum security area because he feared a "known white supremacist" who apparently resides there. As evidence of the existence of this white supremacist, he refers to an incident in which another Muslim minister was attacked in the maximum security area. He has attached a letter from defendant Kearney to him that seems to verify he made the request to be moved and was denied because the violent incident to which he refers occurred ten years prior.

Plaintiff further alleges that defendants denied plaintiff permission to write to his nephew, Larry R. Davis, who apparently is incarcerated in another prison. He has attached a "Correspondence Request Form" signed by defendant MacLennan, which states that MacLennan reviewed plaintiff's file and contacted the other prison but was unable to establish that plaintiff was in fact related to Mr. Davis. Finally, plaintiff repeats an allegation from an earlier complaint that Deputy Warden Bowen improperly handled his appeals from certain disciplinary sanctions.

In addition to the other documents plaintiff attached to his complaint, he attached a letter from Terry L. Miller, who appears to be a coordinator for the "ReShape" program at SCI. ReShape is apparently one of the prison's rehabilitation programs to which plaintiff cannot obtain access, allegedly because inmate facilitators, with SCI officials' consent, will not let "writ writers" into these programs. However, the letter indicates that plaintiff was denied access because he did not meet the necessary criteria: he had not stayed free of disciplinary actions for six months, and he was not classified at minimum or medium security at the time of his request for admission.

Plaintiff also attached a letter from McGee promising that plaintiff can reduce his sanction time if he maintains good behavior. This letter corroborates the fact that plaintiff receives breaks during his punitive segregation approximately every 15 days.

Plaintiff claims that defendants' retaliatory activities violate his right of access to the courts. He also apparently claims that the disciplinary process as applied to him, including the improper classification of the infraction, the improper appeal, and losing his prison job, violates his right to Due Process.

Finally, plaintiff's claim that defendants temporarily confiscated his Kufi could be read to state a violation of his right to free exercise of religion guaranteed by the First Amendment and the Religious Freedom and Restoration Act ("RFRA").

Plaintiff seeks a declaratory judgment, a temporary restraining order, a jury trial, appointment of counsel, and the costs of suit. He also seeks compensatory damages in the amount of $20,000 and punitive damages in the amount of $10,000. Finally, he seeks "[a]ny and all other action this Court deems legal and equitable by law."

### F. *The Sixth Complaint*

Plaintiff alleges that defendants Andrews and Ranger are part of the ongoing conspiracy to retaliate against him. On August 2, 1995, Andrews allegedly told Ranger that plaintiff slid something under the law library door. Plaintiff claims that it would have been impossible for Andrews to have seen who slid the item under the door. He further claims that both defendants wanted to retaliate against him for filing a grievance against the law library because they allegedly knew a disciplinary report would deprive him of an upcoming "honor visit."

Plaintiff also alleges that on August 14, 1995, he forgot a motion at the law library that had to be copied and filed with the Delaware Supreme Court that day. He claims that Andrews refused to allow him to retrieve the motion despite the fact that no rule existed preventing plaintiff from doing so.

Plaintiff apparently claims that defendants' allegedly retaliatory actions violate his right of access to the courts. His complaint also could be read to claim that defendant Andrews's refusal to allow him to retrieve his motion, taken by itself, violated his right of access to courts. He seeks a declaratory judgment, a jury trial, injunctive relief, attorney fees, unspecified compensatory and punitive damages, and "all other action permitted by law."

## II. *DISCUSSION*

■ The federal *in forma pauperis* statute, 28 U.S.C. § 1915, is designed to ensure that indigent litigants have meaningful access to the federal courts. *Neitzke v. Williams,* 490 U.S. 319, 324, 109 S.Ct. 1827, 1831, 104 L.Ed.2d 338 (1989). However, § 1915 creates a significant potential for abuse by prisoner plaintiffs. *Pro se* prisoner plaintiffs do not bear the usual costs of proceeding in federal court, so there is little or no financial barrier to prevent them from bringing meritless litigation. *Id.* at 324, 109 S.Ct. at 1831 ("When Congress opened the door to *in forma pauperis* petitions, it was concerned that the removal of the cost barrier might result in a tidalwave of frivolous or malicious motions filed by persons who gave no pause before crossing the threshold of the courthouse door."). Moreover, many of the traditional economic sanctions available to courts to prevent frivolous lawsuits by private litigants, such as those available with Rule 11 of the Federal Rules of Civil Procedure ("FRCP"), are unavailable or ineffective to deter indigent, *pro se* prisoner plaintiffs.

Plaintiff's activities before this court highlight this potential for abuse. He has filed at least 179 civil rights and habeas corpus actions before this court. All of his previous cases were *in forma pauperis* actions, and most have been dismissed as frivolous under 28 U.S.C. § 1915(d). *See Abdul–Akbar v. Watson,* 901 F.2d 329 (3d Cir.1990) (stating that plaintiff's "history of repetitious and frivolous filings indicates a clear attempt to abuse the courts and the *in forma pauperis* process"). Plaintiff's lack a success, however, has not deterred him from continuing to file meritless *pro se* lawsuits. In the present case, plaintiff also seeks to proceed *in forma pauperis* on a number of spurious claims and allegations.

■ Under § 1915(a), a district court must first determine whether a plaintiff seeking leave to proceed *in forma pauperis* is unable to pay the costs and fees associated with his suit. *Deutsch v. United States,* 67 F.3d 1080, 1085 n. 5 (3d Cir.1995). If the district court determines that a plaintiff is in fact unable to pay the fees and costs associated with his suit, the court may grant the plaintiff leave

to proceed *in forma pauperis.* However, the court may still dismiss the plaintiff's suit if the court is "satisfied that the action is frivolous or malicious." 28 U.S.C. § 1915(d).

It appears from the affidavits submitted by plaintiff that he is unable to pay the fees and costs associated with his suit. However, as set out below, the court will dismiss plaintiff's case as both frivolous and malicious under § 1915(d). In addition, the court will enter an order requiring plaintiff to seek leave of the court before filing any further § 1983 claims.

### A. The Standard for Dismissal as Frivolous or Malicious under 28 U.S.C. § 1915(d)

■ In *Deutsch,* 67 F.3d at 1085–87, the Third Circuit specifically outlined the contours of the frivolousness standard under § 1915(d). A district court may dismiss a claim as legally frivolous if it is based on an indisputably meritless legal theory. *Id.* (citing *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1832). In addition, a district court may dismiss a claim as factually frivolous if the factual contentions are clearly baseless. *Id.* (citing *Denton v. Hernandez,* 504 U.S. 25, 33, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1992), and *Neitzke,* 490 U.S. at 325, 109 S.Ct. at 1831). Finally, a district court may dismiss a claim as frivolous if it is of "little or no weight, value, or importance," "not worthy of serious attention," or "trivial." *Id.*

■ A separate standard for maliciousness is not as well established. *Deutsch* merely states that a district court "must engage in a subjective inquiry into the litigant's motivations at the time of the filing of the lawsuit to determine whether the action is an attempt to vex, injure, or harass the defendants." *Id.* Other Circuits, however, have offered more objective instances of malicious claims. For example, a district court may dismiss a complaint as malicious if it threatens violence or contains disrespectful references to the court. *Crisafi v. Holland,* 655 F.2d 1305 (D.C.Cir.1981); *see also Phillips v. Carey,* 638 F.2d 207, 208 (10th Cir.1981) (stating that courts may dismiss pleadings with abusive or offensive language pursuant to the court's inherent powers under FRCP 12(f)).

In addition, a district court may dismiss a complaint as malicious if it is plainly abusive of the judicial process or merely repeats pending or previously litigated claims. *Id.; Van Meter v. Morgan,* 518 F.2d 366 (8th Cir.), *cert. denied,* 423 U.S. 896, 96 S.Ct. 198, 46 L.Ed.2d 129 (1975); *Duhart v. Carlson,* 469 F.2d 471 (10th Cir.1972), *cert. denied,* 410 U.S. 958, 93 S.Ct. 1431, 35 L.Ed.2d 692 (1973).

### B. Analyzing Plaintiff's Claims Under § 1915(d)

Plaintiff's legal claims fall into seven separate categories. First, he claims that defendants denied his constitutional right of access to the courts. Second, he claims that defendants denied his right to Due Process under the Fourteenth Amendment. Third, he claims that defendants denied his right to Equal Protection under the Fourteenth Amendment. Fourth, he claims that defendants violated his right under the Eighth Amendment to be free from Cruel and Unusual Punishment. Fifth, he claims that defendants violated his right under the Fourth Amendment to be free from Unreasonable Searches and Seizures. Sixth, he claims that defendants denied his right under the First Amendment to Free Exercise of Religion. Seventh, he claims that defendants violated various state and federal laws. Plaintiff also has filed motions for appointment of counsel, for a subpoena duces tecum, and for a permanent injunction and restraining order.

### 1. Plaintiff's Right of Access to the Courts

Plaintiff alleges three separate interferences with his constitutional right of access to the courts. First, he alleges that defendant Andrews would not let him retrieve from the law library a motion that he needed to file. Second, he alleges that he may only use the law library for one hour per day, four days a week. Third, he alleges that defendants have committed a number of acts in a conspiracy to retaliate against him for filing complaints and civil rights suits against them.

■ Prisoners have a constitutional right to "adequate, effective, and meaningful"

access to the courts. *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). In *Peterkin v. Jeffes*, 855 F.2d 1021, 1040–42 (3d Cir.1988), the Third Circuit distinguished between "core" and "ancillary" issues relating to the right of access to the courts under *Bounds*. When a prisoner's allegations implicate the "core" *Bounds* issue—whether "legal assistance" is sufficient to vindicate the right of access to the courts—the prisoner need not show that the prison officials' actions caused actual injury. *Id.* However, when a prisoner's allegations implicate "ancillary" *Bounds* issues—whether access to resources other than legal assistance is sufficient—the prisoner must show actual injury as a result of the prison officials' actions. *Id.*

▮ Plaintiff's claim that defendant Andrews refused to allow plaintiff to retrieve the motion plaintiff left in the library, taken by itself, does not state a constitutional violation. Plaintiff does not allege that defendant destroyed plaintiff's motion or refused to allow him to retrieve the motion during his next visit to the law library. Thus, it appears that plaintiff was denied access to his motion for only a short period of time. When a prisoner is denied legal materials for a short period of time, core rights are not implicated. *See Sheehan v. Beyer*, 51 F.3d 1170, 1173 n. 3 (3d Cir.1995). A plaintiff asserting a short-term denial of legal materials must allege "material prejudice" as a result of the denial. *Id.* Although plaintiff claims that the motion had to be filed that day, apparently as part of an ongoing lawsuit, he does not allege that his failure to file the motion caused his case to be dismissed or otherwise materially prejudiced his efforts to pursue the lawsuit. Furthermore, it appears that plaintiff's negligence in leaving the motion in the library is more responsible for his alleged failure to file the motion on time than any action taken by defendant. Therefore, plaintiff's claim must be dismissed as frivolous.

▮ Plaintiff's claim that he may use the law library for only one hour a day, four days a week, also fails to state a constitutional violation. Plaintiff raised this claim on similar facts while he was incarcerated in the Maximum Security Unit ("MSU") of the Delaware Correctional Center ("DCC") located in Smyrna, Delaware. The Third Circuit noted that plaintiff had "very conspicuous access to the library and legal resources available to MSU inmates," as evidenced by the 74,553 photocopies he had acquired and the 125 cases he had filed up to that date. *Abdul–Akbar v. Watson*, 4 F.3d 195, 205 & nn. 19–20 (3d Cir.1993). Moreover, plaintiff maintained his litigiousness despite the fact that he only had access to a "satellite" law library at MSU for one hour per day. *See Abdul–Akbar v. Watson*, 775 F.Supp. 735, 740 (D.Del.1991), *vacated and remanded,* 4 F.3d 195 (3d Cir.1993). Since the Third Circuit's opinion, plaintiff has filed at least 54 additional federal lawsuits, including the present one, and numerous state criminal and civil actions. Moreover, plaintiff was not incarcerated for that entire period. Even if plaintiff has only one hour per day, four days a week, at SCI's main law library, this limited access clearly does not deny plaintiff "adequate, effective, and meaningful" access to the courts. *See also Hoover v. Watson*, 886 F.Supp. 410, 419–20 (D.Del.1995) (granting summary judgment for defendants on plaintiffs' claim that SCI's limitation of law library time to two or three hours a week violated plaintiffs' right of access to the courts). Therefore, this claim must be dismissed as frivolous.

▮ Plaintiff's final claim is that numerous adverse actions have been taken against him in retaliation for filing lawsuits and complaints against prison officials. Plaintiff correctly asserts that retaliation against him for filing lawsuits against prison officials, if it has occurred, violates his right of access to the courts. *Milhouse v. Carlson*, 652 F.2d 371 (3d Cir.1981). However, this court has previously noted that "[c]laims of unconstitutional retaliation are particularly troublesome because they are fraught with the potential for abuse." *Blizzard v. Hastings*, 886 F.Supp. 405, 409 (D.Del.1995). Every adverse action taken by prison officials against prisoner plaintiffs, whether justifiable or not, can become "evidence" of retaliation by the officials. Therefore, this court adopts the position that, in order to state a claim for unconstitutional retaliation,

a plaintiff must allege that the "retaliatory" action does not advance legitimate penological goals such as preserving institutional order and discipline. *See id.; see also Bell v. Wolfish*, 441 U.S. 520, 540, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979) (stating that prison officials have a legitimate interest in the effective management of a detention facility).

■ Given the extent to which plaintiff has filed lawsuits and grievances against prison officials at SCI, it is conceivable that these officials may harbor ill will toward plaintiff. SCI officials even may scrutinize plaintiff's activities more closely than those of other inmates. However, plaintiff must allege more than the fact that defendants "don't like" him or that they punish him more often or for longer periods of time than other inmates. He must allege that defendants' allegedly retaliatory acts against plaintiff did not advance legitimate penological goals. Moreover, he must state sufficient credible facts in support of his allegations of retaliation. Plaintiff's allegations fail to meet these standards.

Many of plaintiff's allegations involve discretionary administrative actions and decisions. Plaintiff's December 29, 1994 transfer to the medium security "A Tier" was completely within SCI officials' discretion. His inability to gain admission into the Key Program and ReShape resulted from his sentence and his institutional classification. His March 3, 1995 body cavity search apparently resulted from his trip outside the prison and the fact that he was a known drug addict. His December 28, 1994 screening for drugs resulted from a tip by an informant that plaintiff had been smoking marijuana. The refusal to allow him to write to his "nephew" resulted from his counselor's inability to locate or identify this "nephew" despite considerable effort. Finally, his inability to retrieve his forgotten motion on August 14, 1995, probably resulted from law library rules guaranteeing equal access for the large number of SCI inmates to the library's resources.

Most of plaintiff's other allegations involve justifiable punishments for infractions of prison rules and regulations. Plaintiff's complaint demonstrates that the January 4, 1994 disciplinary reports written against him were for theft and failure to obey an order, apparently an order to return the stolen materials. Plaintiff states that his January 5, 1995 transfer to the ASDA was for "threatening behavior," which apparently stemmed from another instance of failing to obey an order. His isolation punishments resulted from those infractions and from failing to obey the order to submit to the body cavity search. The alleged disciplinary report resulting from the August 2, 1995 incident, in which plaintiff slid something under the law library door, probably resulted from the DOC's desire to maintain order regarding the use of the library. Finally, plaintiff was most likely classified as "maximum security" because of his sentence length and his history of disruptive behavior, rather than because he is a "writ writer."

All of these allegedly retaliatory actions appear to advance the legitimate penological goals of order and discipline. None of them support plaintiff's allegations that SCI officials retaliated against him for filing lawsuits.

■ Two of plaintiff's other allegations are merely conclusory. Plaintiff alleges that he sent papers in the mail that an unspecified Court of Appeals did not receive. However, he does not state that prison officials withheld his mail or even were aware that plaintiff was sending papers to a court. Plaintiff also alleges that once he failed to receive notification of a package returned to sender, which appears to be a simple administrative error rather than a punitive action. Conclusory allegations without factual support do not support a claim for relief under 42 U.S.C. § 1983. *Pace Resources, Inc. v. Shrewsbury Township*, 808 F.2d 1023, 1035 (3d Cir.1987).

Finally, the remainder of plaintiff's allegations appear patently false. Plaintiff relates two statements allegedly made to him by prison officials. On January 5, 1995, correctional officer Fisher allegedly told plaintiff that he would "never get anything but hell if [he] did didn't stop filing suits and complaints." During the March 3, 1995 body cavity search, defendant Elliot allegedly told plaintiff, "[you] are confined to your cell be-

cause [you] are a Black Muslim and alway[ ]s suing people." These two statements, particularly the latter, are highly self-serving and unlikely to be true.

As his complaint demonstrates, plaintiff often misrepresents facts when he thinks it will serve his interest. He states that no prisoner on A–Tier had access to education and rehabilitation programs, but he attached a letter in which he stated that over 20% of the residents in fact were "actively involved" in such programs. He implies that his 150 days of sanctions were all given on the same date, but he attached "Appeal Notices" showing that he was sanctioned at two separate hearings over a month apart. He claims that 100 people reside in a space built for 20, but he then states that only 44 people reside in that space. Finally, he often fails to inform the court of the reasons for various disciplinary sanctions and of pending state court actions based on the same claims contained in this complaint.

Plaintiff is an experienced *pro se* litigator. He exaggerates, fabricates, or omits relevant facts in order to survive dismissals for frivolousness. These two statements allegedly made by prison officials appear similarly crafted by plaintiff in an attempt to support his claims of retaliation. These statements, and plaintiff's other allegations of retaliation, "rise to the level of the wholly irrational or wholly incredible," *Denton*, 504 U.S. at 33, 112 S.Ct. at 1733, making them factually frivolous.

Even when all of the events cited by plaintiff are taken as a whole, they fail to demonstrate individual instances of retaliation or a conspiracy to retaliate against plaintiff in order to deprive him of his right of access to the courts. All adverse actions taken against plaintiff were justifiable or discretionary. Moreover, many of plaintiff's allegations are false or conclusory. Similar allegations have been dismissed as frivolous under § 1915(d). *See Williams v. Frame*, 821 F.Supp. 1093 (E.D.Pa.1993) (dismissing a prisoner's claims that prison officials conspired to deny the prisoner's constitutional rights because the complaint was "devoid of credible factual allegations" and because there was "not so much as a hint that Plaintiff's perceived

plight is the result of any 'agreement, either explicit or implicit, to commit an unlawful act, combined with intent to commit the underlying offense' ") (quoting *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir.), *cert. denied*, 479 U.S. 821, 107 S.Ct. 87, 93 L.Ed.2d 40 (1986)). Thus, plaintiff's claim that SCI officials have acted individually or conspired to deny his right of access to the courts must be dismissed as frivolous.

### 2. *Plaintiff's Due Process Claims*

Plaintiff makes five separate claims that his Due Process rights were violated. First, he claims that by failing to let him participate in the Key Program, defendant Washington–Hall violated his right to rehabilitation and treatment. Second, he claims that he was fired summarily from his prison job. Third, he claims that he has been denied the opportunity to earn good time credits because he is not allowed into rehabilitation programs. Fourth, he claims that at his January 7, 1995 disciplinary hearing, he was denied the rights to call a representative, to call witnesses, to confront his accuser, and to examine the written incident reports leading to the hearing. Fifth, he claims that the classification of his infraction was incorrect and that the appeal procedure was incorrect.

As to plaintiff's first two claims, this court has repeatedly told plaintiff that he has no right to drug treatment, employment, or other rehabilitation, education, or training programs in prison. For plaintiff to state a cognizable claim that he was deprived of prison rehabilitation or employment opportunities without due process of law, plaintiff must have either a property or liberty interest in such opportunities. *James v. Quinlan*, 866 F.2d 627, 629 (3d Cir.1989). The Due Process Clause does not by itself give plaintiff such a property or liberty interest. *See James*, 866 F.2d at 629–30; *Bulger v. United States Bureau of Prisons*, 65 F.3d 48, 50 & nn. 3–4 (5th Cir.1995). Thus, plaintiff must demonstrate that such interests derive from some other source.

To establish a property or liberty interest deriving from some source other than the Due Process Clause, plaintiff must

show either that he has "legitimate claim of entitlement" to prison rehabilitation and employment opportunities, *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), or that failing to have such opportunities constitutes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin v. Conner*, —— U.S. ——, —— –——, 115 S.Ct. 2293, 2298–2301, 132 L.Ed.2d 418 (1995). Given that prison rehabilitation and employment are discretionary opportunities that prison officials are not required to supply, plaintiff cannot argue that he has a "legitimate entitlement" to such opportunities or that the lack of such opportunities creates "an atypical and significant hardship." *See James*, 866 F.2d at 629–30; *Bulger*, 65 F.3d 48, 49–50 & nn. 3–4 (5th Cir. 1995); *see also Dutton v. Watson*, C.A. No. 92C–12–210–1–CV, 1994 WL 164486 at *3 (Del.Super.Ct. April 28, 1994) (holding that no relevant Delaware statutes create a property or liberty interest in prison employment), *aff'd*, 659 A.2d 227 (Del.1994).

 As the Delaware Chancery Court has stated to plaintiff so eloquently:

> What is fatally defective with the substantive due process claim that inmates have a constitutional right to educational programs or gainful employment is that no constitutional right of that type exists in the wider society. While the government may construct myriad statutory or regulatory programs to promote education, training, and employment, these programs are discretionary attempts to promote the public good. They do not reflect rights deriving from the fundamental document of our government. To find these rights arising within the prison would be assuming that plaintiff['s] conviction created new constitutional rights for [him].

*Abdul–Akbar v. Delaware Department of Corrections*, 1994 WL 469189, at *1 (Del.Ch. Ct. Aug. 11, 1994). Thus, plaintiff's first two Due Process claims must be dismissed as frivolous. In addition, plaintiff has litigated variations on these claims at least three times before and lost. *See id.; Abdul–Akbar v. Washington–Hall*, 649 A.2d 808 (Del. Supr.1994); *Abdul–Akbar v. Correctional*

*Medical Systems*, 1991 WL 50151, at *3–4 (Del.Ch.Ct. March 21, 1991). Thus, they must also be dismissed as malicious.

 Plaintiff's third claim, that he is denied the opportunity to earn good-time credits through participation in rehabilitation programs, also fails to state a Due Process violation because plaintiff has no protectable liberty interest. The Due Process Clause does not by itself guarantee the right to earn good-time credits. *See Wolff v. McDonnell*, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). Moreover, failing to have one type of opportunity to reduce a lawfully imposed sentence through earning good-time credits can hardly constitute an "atypical and significant hardship" under *Sandin*. Therefore, plaintiff's third Due Process claim must be dismissed as frivolous. Plaintiff has also litigated this claim before and lost. *See Abdul–Akbar v. Delaware Department of Corrections*, 1994 WL 469189 (Del.Ch.Ct. Aug. 11, 1994). Thus, it must be dismissed as malicious as well.

 As to plaintiff's two remaining Due Process claims regarding the disciplinary hearing and appeal, plaintiff cannot establish that he has a protected liberty interest in remaining free from solitary confinement. Solitary confinement does not automatically trigger due process concerns. *Sandin*, —— U.S. at —— –——, 115 S.Ct. at 2299–300. Only such punishment that imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" will invoke the protections of the Due Process Clause. *Id.*

 Although plaintiff claims he received an isolation sanction of 150 days, he actually received three separate sanctions, for 15, 30 and 45 days, respectively, as a result of his January 7, 1995 disciplinary hearing. Plaintiff received an additional sanction of 60 days isolation as a result of the February 8, 1995 disciplinary hearing. Each sanction was well within the 90–day limitation in the DOC rules regarding isolation sanctions for the infractions that plaintiff committed. Furthermore, isolation segregation does not appear to be materially different at SCI than administrative detention, and under DOC regulations a

prisoner may be transferred to ASDA for any length of time and for almost any reason. *See Blizzard v. Watson,* 892 F.Supp. 587, 597 (D.Del.1995). Plaintiff does not allege that the conditions of the solitary confinement at SCI are unhealthy or otherwise inhumane. The court holds that even the longest aggregation of sanctions given during one hearing, 90 days in isolation, does not by itself so disrupt the life of plaintiff that it constitutes an "atypical and significant hardship" under *Sandin.*

 Even assuming that plaintiff did have a liberty interest in remaining free from solitary confinement for that length of time, it is clear that plaintiff received due process. The process due to a prisoner amounts to no more than notice of the charges and an opportunity to be heard. *Blizzard,* 886 F.Supp. at 409; *Fridge v. Nixon,* C.A. No. 83–193–LON (D.Del. Jan. 30, 1985). Plaintiff admits that he received notice and that he "gave [his] side of the story." In addition, plaintiff's only contention that his disciplinary appeal violated his Due Process rights consists of the fact that the Deputy Warden, rather than the Warden, decided his appeal. Plaintiff does not allege that the appeal was unfair. Thus, plaintiff's remaining two Due Process claims must be dismissed as frivolous.

### 3. *Plaintiff's Equal Protection Claims*

Plaintiff makes five separate Equal Protection claims. First, plaintiff alleges that allowing other prisoners into the Key Program while denying plaintiff access unlawfully discriminates against him. Second, he claims that allowing other inmates the opportunity to earn good-time credits through participation in rehabilitation programs while denying that opportunity to plaintiff unlawfully discriminates against him. Third, he claims that giving him a body cavity search after returning from outside the prison, while failing similarly to search other prisoners who return from outside visits, unlawfully discriminates against him. Fourth, he alleges that by administering greater sanctions at SCI, prison officials are unlawfully discriminating between inmates of different institutions. Fifth, he claims that defendant Elli-

ot's alleged statement to plaintiff, "[you] are confined to your cell because [you] are a Black Muslim and alway[ ]s suing people," unlawfully discriminates against plaintiff on the basis of race and religion.

 Prisoners are not a suspect class. *Pryor v. Brennan,* 914 F.2d 921, 923 (7th Cir.1990). In addition, prisoners have no fundamental right to participate in prison rehabilitation programs, to avoid body cavity searches, or to earn good-time credits. Therefore, plaintiff's first three claims are subject only to rational basis scrutiny. *See, e.g., Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *see also Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if is reasonably related to legitimate penological interests.").

 As part of managing limited prison resources and maintaining order and discipline, prison officials must have discretion to determine who receives the benefit of prison rehabilitation programs and good-time credits. In addition, they must have discretion to determine which methods the prison will use to detect and stop the flow of illegal drugs. Defendants appear to have exercised their discretion rationally. SCI's use of security classification, which is a result of the inmate's behavioral record and sentence length, to determine who receives the benefit of these programs ensures that limited resources are given to prisoners who have demonstrated good behavior or who will be released sooner. In addition, tying participation in such programs to an award of good-time credit encourages prisoners to decrease their security classifications and the lengths of their sentences through good behavior. Finally, performing body cavity searches on known drug addicts after they return from visits outside the prison helps ensure that illegal drugs and other contraband will not enter the prison. Thus, plaintiff's first three claims must be dismissed as frivolous.

 Plaintiff's fourth allegation, that SCI unlawfully administers higher sanctions

than other prisons, also fails to state a constitutional claim. The Equal Protection Clause does not require that identical rules govern each prison. *Turner v. Safley,* 482 U.S. 78, 95 n.*, 107 S.Ct. 2254, 2265 n.*, 96 L.Ed.2d 64 (1987). Disciplinary treatment may be more severe at one prison than at another. *See Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976) ("That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules."). Thus, plaintiff's fourth claim must be dismissed as frivolous.

■■■ Plaintiff's final Equal Protection claim is that defendant Elliot discriminated against plaintiff when he allegedly committed plaintiff to isolation for being a "Black Muslim" that is "alway[ ]s suing people." The Fourteenth Amendment generally bars racial and religious discrimination by state actors. *See, e.g., Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (holding that every prisoner is entitled to "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners"); *Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967) (holding that race is a "suspect classification" under the Equal Protection Clause). However, as set out in the discussion dismissing plaintiff's claim that defendants have denied his right of access to the courts, plaintiff's allegation appears self-serving and calculated to advance his litigation goals. In other words, the allegation rises "to the level of the wholly irrational or wholly incredible." *Denton,* 504 U.S. at 33, 112 S.Ct. at 1733. Thus, plaintiff's final Equal Protection claim must be dismissed as frivolous.

4. *Plaintiff's Eighth Amendment Claims*

Plaintiff makes a number of claims that the conditions of his and other inmates' confinement at SCI constitute Cruel and Unusual Punishment. Specifically, plaintiff claims that his isolation sanctions, the overcrowdedness of SCI, the noise level, the cold meals on an unsanitary cart, and the overall conditions of the prison violate his and others'

rights under the Eighth Amendment. Plaintiff apparently also claims that his failure to receive a hernia operation upon demand violates the Eighth Amendment. Finally, plaintiff claims that the body cavity search performed on plaintiff by defendant Mumford constitutes Cruel and Unusual Punishment.

■■■ In order to state a violation of the Eighth Amendment based on conditions of confinement, plaintiff must prove that defendants acted with deliberate indifference to deprive him of the "minimal civilized measure of life's necessities." *Wilson v. Seiter,* 501 U.S. 294, 298, 303, 111 S.Ct. 2321, 2324, 2326, 115 L.Ed.2d 271 (1991). A constitutional violation only occurs when the conditions of confinement "have a mutually reinforcing effect that produces the deprivation of a single identifiable human need such as food, warmth or exercise," and that "[n]othing so amorphous as 'overall conditions' can rise to the level of [such a violation] when no specific deprivation of a single human need exists." *Id.* at 303–04, 111 S.Ct. at 2326–27.

■■■ This court has previously held that being housed for 90 days in punitive segregation does not by itself constitute Cruel and Unusual Punishment. *Blizzard,* 892 F.Supp. at 598 (D.Del.1995); *see also Young v. Quinlan,* 960 F.2d 351 (3d Cir.1992) ("[s]egregated detention is not cruel and unusual punishment *per se* "); *Knuckles v. Prasse,* 302 F.Supp. 1036 (E.D.Pa.1969), *affd,* 435 F.2d 1255 (3d Cir.1970), *cert. denied,* 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971). In addition, plaintiff admits that he receives a break every fifteen days when he serves his sanctions. Therefore, even if plaintiff served his 60–day sanction immediately after his 90–day sanction, he has never been in punitive segregation for more than fifteen days at a time. Plaintiff does not otherwise allege that he is denied "identifiable human needs" while in punitive segregation. Thus, plaintiff's claim based on the length of his sanctions in punitive segregation must be dismissed as frivolous.

■■■ Plaintiff's Eighth Amendment claim with regard to the isolation sanctions could also be read to challenge the proportionality of the length of the sanctions to the offenses

committed. *See Johnson v. Anderson*, 370 F.Supp. 1373, 1388 (D.Del.1974) (stating that "lengthy and arduous solitary confinement, imposed for a comparatively trivial infraction, requires closer scrutiny"). However, plaintiff's sanctions do not appear disproportionate to his overall conduct. Plaintiff was the subject of three disciplinary reports in two days. One report was for theft and two for failing to obey an order by a prison guard. In response, plaintiff received a sanction of 15 days for the first infraction, 30 days for the second, and 45 days for the third. Furthermore, plaintiff was the subject of a fourth disciplinary report one month later for failing to obey an order, for which he received a 60–day sanction. Defendants logically responded to plaintiff's refusal to abide by the rules by increasing the period of the sanction for each subsequent infraction. Defendants' response is particularly understandable because plaintiff committed the same infraction three times in one month. Thus, plaintiff's claim that his punishment is disproportionate must be dismissed as frivolous.

This court has previously addressed conditions of confinement at SCI. *See Hoover*, 886 F.Supp. at 412–17. In *Hoover*, prisoner plaintiffs alleged that the SCI pre-trial building was, among other things, overcrowded, unsanitary, and noisy. *Id.* The court determined that "[w]hile plaintiffs may not be as comfortable in their cells at the SCI pre-trial building as they would like, they have not alleged facts [suggesting] that they have been deprived of 'identifiable human needs.'" *Id.*

■ Although the present case concerns overcrowding, noise levels, and cold meals among the general prison population at SCI, Abdul–Akbar also fails to allege that he and the potential class of plaintiffs he wishes to certify have been deprived of any "identifiable human need." In addition, the court finds that other problems alleged by plaintiff, such as stress, tension, potential incompatibility of cellmates, and the presence of white supremacists, constitute "amorphous conditions" that do not indicate that plaintiff has been harmed or otherwise deprived of a particular human need. *See id.* Finally, to the

extent that any of these problems exist, plaintiff has not alleged facts to suggest that defendants acted with deliberate indifference to these problems. Thus, plaintiff's conditions of confinement claims must be dismissed as frivolous.

■ To succeed on his claim under the Eighth Amendment that he received inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). As the Third Circuit has stated: "[T]he law is clear that simple medical malpractice is insufficient to present a constitutional violation." *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir.1993); *see White v. Napoleon*, 897 F.2d 103, 108 (3d Cir.1990). Plaintiff claims that defendants refuse to give him a hernia operation because they must provide care for others with more serious needs. It is questionable whether a hernia is a "serious medical need." Moreover, plaintiff's allegations certainly do not demonstrate that defendants are committing malpractice, much less being deliberately indifferent to plaintiff's medical needs. Thus, plaintiff's medical claim must be dismissed as frivolous.

■ As to plaintiff's claim that the body cavity search constituted cruel and unusual punishment, plaintiff fails to allege "unnecessary and wanton infliction of pain" by defendant Mumford in performing the search. *Levoy v. Mills*, 788 F.2d 1437, 1439 (10th Cir. 1986); *United States v. Caldwell*, 750 F.2d 341 (5th Cir.1984); *see Estelle*, 429 U.S. at 104, 97 S.Ct. at 291. Thus, this claim must be dismissed as frivolous.

### 5. *Plaintiff's Fourth Amendment Claims*

Plaintiff claims that his December 28, 1994 non-random drug screening and defendant Mumford's body cavity search of plaintiff violated his Fourth Amendment right to be free of unreasonable searches and seizures. Although plaintiff does not specify, the body cavity search apparently was a visual inspection rather than a physically intrusive inspection. Plaintiff states that defendant Mumford was told to "look up [plaintiff's] rectum."

In addition, an attached March 1, 1995 Disciplinary Report written by Mumford refers to the incident as a "routine strip search."

■ A drug test, whether through a blood test or urinalysis, is a search under the Fourth Amendment. *See, e.g., Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (holding that a blood test is a search under the Fourth Amendment); *Forbes v. Trigg,* 976 F.2d 308 (7th Cir.1992) (holding that urinalysis is analogous to a blood test). A body cavity search is also a search under the Fourth Amendment. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). However, the Fourth Amendment only prevents unreasonable searches. *Id.* The Supreme Court has stated that "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Id.* at 559, 99 S.Ct. at 1884. "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it was conducted." *Id.*

■ In *Bell,* the Supreme Court held that visual body cavity inspections of prisoners after contact visits with individuals from outside the prison are not unreasonable searches under the Fourth Amendment if they are conducted in a nonabusive manner. *Id.* at 559–60, 99 S.Ct. at 1884–85. Plaintiff was subjected to his body cavity search after returning from a Muslim service outside of the prison. Thus, plaintiff was clearly in contact with individuals outside of the prison. In addition, the body cavity search was visual rather than physically intrusive. Finally, plaintiff does not allege, nor does it otherwise appear, that defendant Mumford conducted the body cavity search in an abusive manner. Thus, plaintiff's body cavity search was reasonable, and his claim based on that search must be dismissed as frivolous.

■ Plaintiff's non-random drug screening was reasonable as well. Plaintiff states that the prison officials tested him because they received a tip that plaintiff was smoking marijuana. In addition, the prison officials knew, and plaintiff readily admits, that he has a long history of drug abuse. *See*

*McDiffett v. Stotts,* 902 F.Supp. 1419, at 1424 (D.Kan.1995) (upholding a non-random urinalysis because the prisoner had a history of drug abuse and the prison officials received a tip that the prisoner had been smoking marijuana two days prior). Plaintiff does not allege that the test returned a negative result, nor does he allege that the test was performed in any degrading or humiliating fashion. Thus, plaintiff's claim based on the drug screening must be dismissed as frivolous.

6. *Plaintiff's Free Exercise of Religion Claims*

Plaintiff claims that his right to free exercise of religion guaranteed by the First Amendment was violated in three different ways. First, plaintiff claims that defendants MacLennan and Kearney were responsible for confiscating plaintiff's kufi when they placed him in the ASDA. Second, plaintiff claims that a defendant Mumford once refused to address plaintiff by his new Muslim name. Third, plaintiff claims that defendant Elliot told him, "[you] are confined to your cell because [you] are a Black Muslim and alway[ ]s suing people."

■ Federal courts formerly examined free exercise claims under the "reasonableness" test established by the Supreme Court in *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). In 1993, however, Congress enacted the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, to require courts addressing free exercise claims to apply the "compelling interest" test established by the Supreme Court in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). *See* 42 U.S.C. § 2000bb(b). The RFRA provides:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

The broad language of the act and its legislative history indicate that it clearly applies to free exercise challenges to prison regulations. *See* S.Rep. No. 101–111, 103d Cong., 1st Sess. (1993), U.S.S.C.A.N.1993, p. 1488; *see also Brown–El v. Harris,* 26 F.3d 68 (8th Cir.1994); *Muslim v. Frame,* 891 F.Supp. 226 (E.D.Pa.1995).

There is a question whether the RFRA is constitutional. *See* Christopher L. Eisgruber & Lawrence G. Sager, *Why the Religious Freedom Restoration Act is Unconstitutional,* 69 N.Y.U.L.Rev. 437 (1994). However, the court will assume the constitutionality of the RFRA for the sake of this decision.

 Under the standard established by the RFRA, a plaintiff bears the initial burden of establishing that a prison regulation substantially burdens a religious practice that is mandated by his religion. *See, e.g., Werner v. McCotter,* 49 F.3d 1476 (10th Cir. 1995); *Bryant v. Gomez,* 46 F.3d 948 (9th Cir.1995); *but see Muslim,* 891 F.Supp. at 229. Plaintiff fails to allege that wearing a kufi or being addressed by his Muslim name is mandated by his religion. Even if wearing a kufi or being addressed by his Muslim name are mandated by his religion, however, plaintiff fails to allege how temporarily confiscating his kufi during the time he spent in the ASDA or how having one guard fail to address plaintiff by his Muslim name during one incident substantially burdened his free exercise of his religion. Therefore, plaintiff's first two claims must be dismissed as frivolous.

 As to plaintiff's third claim concerning defendant Elliot's alleged statement, for the reasons set out in the discussion dismissing plaintiff's claim that defendants have denied his right of access to the courts, plaintiff's allegation appears self-serving and cal-culated to advance his litigation goals. In other words, the allegation rises "to the level of the wholly irrational or wholly incredible." *Denton,* 504 U.S. at 33, 112 S.Ct. at 1733. Thus, this claim must be dismissed as frivolous.

### 7. *Plaintiff's Remaining Nonconstitutional Claims*

 Plaintiff makes a number of nonconstitutional claims. He claims that defendant Washington–Hall's refusal to allow plaintiff into the Key Program constituted illegal racketeering and an abuse of discretion. In addition, he claims that prison officials failed to follow Delaware law and regulations in many different ways. The racketeering claim is patently frivolous. Any constitutional aspects of the other claims have been dealt with in previous sections. As nonconstitutional claims, they are not cognizable under 42 U.S.C. § 1983. Thus, all of these nonconstitutional claims must be dismissed as frivolous.

### 8. *Plaintiff's Motions*

Plaintiff has moved for appointment of counsel, for a subpoena duces tecum, for injunctive relief, and for a restraining order. All of these motions, in addition to any other requests for assistance or relief, are dismissed as moot.

### C. *Deterring Future Frivolous Claims by Plaintiff*

 When a district court concludes that a particular litigant "has abused the judicial process by filing a multitude of frivolous § 1983 cases in a relatively brief time and will continue to file such cases unless restrained," that court may enjoin that litigant from filing future § 1983 claims without leave of the court. *Abdul–Akbar,* 901 F.2d at 333. The court may require that, in seeking such leave, the litigant certify: "(1) that the claims he wishes to present are new claims never before raised and disposed of on the merits by any federal courts, (2) that he believes the facts alleged in his complaint to be true, and (3) that he knows of no reason to believe his claims are foreclosed by controlling law." *Id.* The injunction should state

that "upon failure to certify or upon a false certification, the litigant may be found in contempt of court and punished accordingly." *Id.*

■ The Third Circuit literally designed this rule for Abdul–Akbar. His "history of repetitious and frivolous filings indicates a clear intent to abuse the courts and the *in forma pauperis* process." *Id.* at 334. The court finds that since the Third Circuit's 1990 opinion in which it made these observations of plaintiff, he has continued to file numerous frivolous and malicious claims in both state and federal court. Clearly, the normal safeguards of § 1915(d) do not deter Abdul–Akbar from filing such claims. Thus, the court will enter an injunction against Abdul–Akbar in accordance with the Third Circuit's opinion. In addition, to prevent plaintiff's malicious filing of claims either simultaneously or successively in state and federal court, the court will require plaintiff to certify that no new claims have been raised and disposed of on the merits in any federal or state court.

This injunction is hardly an ideal remedy because the court will still be forced to review each of plaintiff's new allegations. However, it appears to be the only tool the court possesses to prevent Abdul–Akbar's continued abuse of the judicial process. This injunction "will demonstrate to Abdul–Akbar that 'we are saying point-blank that if he continues to show his contempt for the orderly judicial process, that process will accord him further time in prison as summarily as the law allows.'" *Id.* (quoting *In re Green,* 669 F.2d 779, 787 (D.C.Cir.1981)).

The court will issue an order in accordance with this Opinion.