Richard Martin TALBERT, Plaintiff,

v.

George M. HINKLE, Dr. Ward, Ronald J. Angelone, Edward C. Morris, James E. Briggs, Gene Johnson, Larry W. Huffman, Carolyn M. Parker, Claude W. Mitchell, Furman S. Robinson, Norma J. Smith, Kim S. Cox, Tamara M. Gardener, Nancy K. Buswell, Emily T. Law, Roland Villars, Maurice Noirot, B. Lewis, Nurse Elam, Nurse Ross, Lt. Philips, Lt. Sizemore, Sgt. Hill, Sgt. Somer, Lt. Hoffman, c/o R. Lewis, c/o Johnson, c/o Wiggins, c/o Chamblee, Sgt. Martin, c/o S. King, Lt. Henry L. Campbell, Lonnie M. Saunders, Jack Lee, S. Taylor, Rob Byrd, T. Lawhorn, V. Grant, B. Brerenton, Counselor Bady, J. Mueller, Counselor Neely, Capt. Boyer, Lt. Redman, Sgt. Crawford, S. Murphy, P. Ingram, c/o M.G. Harris, Edie Pearson, Ray Arp, and Y. Moore–Rogers, Defendants.

Civ. A. No. 2:94CV1042.

United States District Court,
E.D. Virginia,
Norfolk Division.

March 28, 1997.

Richard Martin Talbert, Dillwyn, VA, pro se.

Jill Theresa Bowers, Office of Attorney General, Commonwealth of Virginia, Richmond, VA, for Defendants.

## OPINION AND FINAL ORDER

REBECCA BEACH SMITH, District Judge.

This matter is before the court on defendants' motion for summary judgment. For the reasons set forth below, the court GRANTS defendants' motion.

### I. Background and Procedural History

Plaintiff Richard Martin Talbert, a Virginia inmate proceeding *pro se*, submitted a verified complaint pursuant to 42 U.S.C. § 1983 seeking to redress alleged violations of his constitutional rights. Plaintiff claimed that defendant Hinkle "et seq." retaliated against him by placing him in administrative segregation, in violation of his right to be free from retaliatory conduct under the First and Fourteenth Amendments.[1] Plaintiff sought injunctive relief.

Upon receiving payment of the assessed partial filing fee of $64.41, the court granted plaintiff's motion to amend and to add defendants and directed him to submit the amended complaint. See Order filed March 14, 1995. By motion filed March 22, 1995, plaintiff requested appointment of counsel. On April 6, 1995, plaintiff filed a motion for leave to submit an amended complaint in excess of fifty pages. On May 5, 1995, plaintiff also submitted a motion for a preliminary injunction to allow him to enter into the grievance procedure at Indian Creek Correctional Center. By Order entered May 25, 1995, the court denied all three motions.[2] The court further instructed plaintiff that not only was he to limit his amended complaint to fifty pages, but that he was to limit it to the issue of retaliation.[3]

The court received amended complaints from plaintiff on May 30, 1995 and September 11, 1995. These amended complaints were in violation of the court's May 25, 1995 Order and were therefore filed subject to defect. On December 5, 1995, plaintiff finally submitted an amended complaint that was not in excess of the fifty-page limit. Accordingly, by Order entered December 12, 1995, the court directed the Clerk to file the amended complaint and ordered the defendants to respond to plaintiff's complaint and amended complaint. Defendants were advised that the action was limited to the issues involving retaliation. In his amended complaint, in addition to the injunctive relief he had originally sought, plaintiff requested nominal, compensatory, and punitive damages.

On January 26, 1996, Assistant Attorney General Jill Bowers filed a Waiver of Service

---

1. The Court notes that it construes plaintiff's complaint liberally. *Gordon v. Leeke,* 574 F.2d 1147, 1151 (4th Cir.), *cert. denied,* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978).

2. The court noted that it was not clear that the motion for a preliminary injunction related in any way to plaintiff's present complaint regarding retaliation.

3. The court explained if plaintiff wished to raise other claims, he should submit a new complaint addressing those issues.

Summons on behalf of most of the defendants. The Assistant Attorney General indicated that the Commonwealth of Virginia was not able to accept service for Tamara M. Gardener, John Doe, Nurse Ross, Lt. Philips, C/O Johnson, C/O Wiggins, B. Brerenton, and P. Ingram because they were either no longer employed by the Virginia Department of Corrections or plaintiff had failed to include enough identifying information about the defendant. No response was received concerning defendant Maurice Noirot at that time.

On February 6, 1996, plaintiff filed a letter asking the Court to provide him with addresses for the eight defendants for which the Commonwealth of Virginia was unable to accept service. On February 12, 1996, the 41 defendants that filed a Waiver of Service Summons filed a Motion for Summary Judgment and Memorandum in Support. The affidavit of Carolyn W. Parker was also filed in support of the motion. On March 1, 1996, plaintiff filed a response to that summary judgment motion with supporting materials, including his own affidavit. Plaintiff also submitted the affidavits of Chris Walker, Dalroy Washington, Steven C. Gardner, and Reginald Haskins but, because they are photocopies and do not bear an original signature, they cannot be considered by the court.

On March 27, 1996, an Assistant Attorney General filed a Waiver of Service of Summons on behalf of defendant Maurice Noirot and a motion to amend the summary judgment to include defendant Maurice Noirot. Counsel also filed an Answer on behalf of all defendants that had waived service. On April 1, 1996, plaintiff filed a letter with the Court wherein he asked if he needed to file further pleadings.

In its Order entered April 10, 1996, the court granted defendants' motion to amend the motion for summary judgment to include defendant Noirot. The court also granted plaintiff additional time in which to respond to the summary judgment motion. Finally, the court advised plaintiff that it was unable to notify the remaining defendants that an action had been commenced against them without additional information. Therefore, plaintiff was ordered, if he wished the suit to

proceed against these defendants, to provide the names or other identifying specific enough to allow the court to identify each person. Moreover, for defendants Tamara M. Gardener, Nurse Ross, Lt. Philips, B. Brerenton and P. Ingram, who were no longer employed with the Virginia Department of Corrections, plaintiff was ordered to provide the correct address for each individual. Plaintiff was advised that failure to provide further identifying information would result in the dismissal from this action of each defendant that was not further identified.

On May 17, 1996, plaintiff responded with respect to the eight remaining defendants. Although plaintiff did provide some further descriptive information concerning the physical appearance and job function of defendants Tamara M. Gardener, Nurse Ross, Lt. Philips, B. Brerenton, and P. Ingram, plaintiff did not provide any of the required addresses. Accordingly, by Order entered June 5, 1996, the court dismissed defendants Gardener, Ross, Philips, Brerenton, and P. Ingram from this action without prejudice.

In his May 17, 1996 response, plaintiff identified defendant Dr. John Doe as Dr. Ward. Plaintiff also advised the Court that Dr. Ward was deceased and that he therefore wished to dismiss him as a defendant in this action. Accordingly, the court ordered defendant Ward dismissed from this action in its Order entered June 5, 1996.

Plaintiff also submitted further identifying information about defendants C/O Johnson and C/O Wiggins. Counsel for defendants subsequently identified defendants and returned a Waiver of Service of Summons on behalf of them. By order entered September 17, 1996, the court directed defendants Johnson and Wiggins to file responsive pleadings within thirty days from the date of the Order. On October 16, 1996, a Motion to Adopt Previous Filings and Memorandum in Support on behalf of defendants Johnson and Wiggins was filed in the Alexandria Division of the Eastern District of Virginia. This motion was received in the Norfolk Division on October 23, 1996. The court will accept this motion as timely filed and GRANTS the motion to adopt previous filings. Plaintiff subsequently submitted a motion to incorpo-

rate his previous response to the summary judgment motion against these two defendants. The court GRANTS this motion as well. Consequently, the summary judgment motion is now ready for judicial determination. The court notes that there are forty-five defendants remaining in this action.

## II. Defendants' Motion for Summary Judgment

### A. Standard of Review

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See. e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Terry's Floor Fashions v. Burlington Indus.,* 763 F.2d 604, 610 (4th Cir.1985). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial. *Celotex Corp.,* 477 U.S. at 322–24, 106 S.Ct. at 2552–53. Such facts must be presented in the form of exhibits and sworn affidavits. Failure by plaintiff to rebut defendants' motion with such evidence on his behalf will result in summary judgment when appropriate. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. Because plaintiff has failed to meet his burden, the court **GRANTS** defendants' motion for summary judgment.

### B. Plaintiff's Retaliation Claims

As the court has noted in two of its previous orders, this action is based solely on plaintiff's claims of retaliation. Plaintiff's precise retaliation claims are difficult to discern, however, because of the vast number of factual allegations included in the Complaint and Amended Complaint.[4] After reading all of plaintiff's factual assertions, the court believes plaintiff's claims of retaliation can be summed up as follows:[5] (1) that defendant Parker fired plaintiff from his job in the Haynesville Correctional Center (HCC) law library on September 8, 1994 in retaliation for his filing of a class action lawsuit on August 1, 1994; (2) that plaintiff was placed in strip cell status at HCC and later transferred to Augusta Correctional Center (ACC) in retaliation either for sharing a letter with other inmates that he received from a Virginia State Senator or in order to punish him for his litigation activities; and (3) that following these events at HCC, various alleged constitutional violations occurring at ACC and Indian Creek Correctional Center (ICCC) were also done in retaliation by defendants at these institutions for plaintiff's activities at HCC. The court notes that among the constitutional deprivations plaintiff asserted in his Complaint and Amended Complaint which the court has declined to consider are allegations of various due process violations, property deprivation claims, improper losses of good time credits, and claims of inadequate medical care.

### C. Facts

The relevant facts underlying plaintiff's retaliation claims are as follows. Plaintiff began working at the law library at HCC at the end of December, 1993. Pl.'s Br. in Opp'n, Exh. A. Plaintiff alleges that defendant Parker, his supervisor at the law library, threatened his life[6] for unspecified reasons on ap-

---

**4.** Plaintiff's amended complaint alone is comprised of forty-nine single-spaced pages, of which at least thirty-nine consist of numbered paragraphs containing factual allegations.

**5.** In their summary judgment motion, defendants concluded that these, or similar claims, were the claims upon which plaintiff appeared to be bas-

ing his lawsuit. In his response to defendants' summary judgment motion, plaintiff did not dispute this characterization of his claims.

**6.** Plaintiff claims that defendant Parker told him, "I'm a killer ... I'll kill you."

proximately January 1, 1994, during a law library meeting. Talbert Aff. ¶ 10.

Around that same time, plaintiff claims that he began grieving the use of social security numbers by the correctional facility. *Id.* ¶ 12. He continued the grievance process during the Winter and Spring of 1994.[7] Plaintiff also indicates that he filed some other informal complaints during this time period regarding other incidents at HCC. *See* Talbert Aff. ¶¶ 21–22. These included his concerns about legal assistance at HCC.[8] *Id.* ¶ 25, 39.

On June 21, 1994, plaintiff was reduced from a legal researcher to a File Clerk/Typist by defendant Parker. Talbert Aff. ¶ 27. In his new capacity, he was barred from "assisting inmates with legal concerns" while on duty. Pl.'s Br. In Opp'n at 13 & Exh B. Plaintiff states that when defendant Parker handed him his demotion notice she told him that the prison could not be responsible for plaintiff's "giving out false information." Talbert Aff. ¶ 28. Plaintiff argues that he did not give out false or erroneous information. Pl.'s Br. in Opp'n at 13. He claims that he was given excellent monthly reviews up until that point. *See id.* at 13–14. He has submitted copies of these reports, which demonstrate that defendant Parker's evaluations of his job performance registered a decline in plaintiff's attitude, quantity, and quality of work beginning in June of 1994. Pl.'s Br. in Opp'n, Exh. C.

According to plaintiff, because he was an alternate member of the Inmate Advisory Committee, the fact that he was barred from assisting inmates with research at work created a "conflict of interests." Talbert Aff. ¶ 30. Plaintiff indicates that he was very interested in obtaining legal training so that he could assist the inmates with bankruptcy

and divorce problems. *Id.* ¶ 34. He also claims that three to five people asked him for assistance each day, but he was forced to turn them down. *Id.* ¶ 36.

At some point after he was demoted, plaintiff admits that he was reproached by defendant Parker for typing a grievance form which, because it is not a legal form or document, was apparently not part of his job duties. *Id.* ¶ 43.

Plaintiff also alleges that at various times during this period, he informed other staff members at HCC, defendants Gardener, Law, and Sudduth, about his ongoing problems with defendant Parker. *See, e.g.,* ¶¶ 43, 46, 89.

On or about August 1, 1994, plaintiff filed a lawsuit with fellow inmate Steven Whisenant against Governor Allen and the Virginia Parole Board. Am.Compl. ¶ 16; Talbert Aff. ¶ 47. In their complaint, plaintiff and Mr. Whisenant alleged that the governor's recent appointees to the parole board were victims of heinous crimes, former law enforcement agents, or members of crime prevention associations and, as such, were biased against inmates. They also sought class certification. Around this same time, plaintiff and Mr. Whisenant also sent mass mailings concerning this parole issue to newspapers, television and radio stations, state senators, and United States Congressmen. *Id.* ¶ 50.

Plaintiff claims that shortly thereafter, defendant Parker threatened to fire everyone in the law library because a letter had been written to a United States Magistrate Judge and she believed the library employees were "practicing law." Talbert Aff. ¶ 49. He further claims that, in the middle of August 1994, he had an argument with defendant Parker about his interest in receiving legal training. Am.Compl. ¶ 17.

---

7. After plaintiff received responses to his social security number grievance, he appealed to defendant Hinkle and defendant Huffman. *Id.* ¶¶ 12–14. On or about March 15, 1994, plaintiff filed a lawsuit concerning this issue. *Id.* ¶ 19; Am. Compl. ¶ 11.

8. Plaintiff was concerned because the court-appointed attorneys did not assist inmates on certain matters, such as divorce and bankruptcy. Br. in Opp'n, Attach. Letter from Talbert to

Hinkle of 5/18/94 [hereinafter Letter to Hinkle of 5/18/94]. He also indicated that the court-appointed attorneys had told him that they had been instructed by the local Commonwealth Attorneys Office not to help inmates with civil rights actions. *Id.; see also* Br. in Opp'n, Attach. Letter from Hinkle to Kilgore of 6/9/94. He suggested that the inmates employed at the law library as researchers, such as himself, be given legal training so they could help the other inmates. Letter to Hinkle of 5/18/94.

Plaintiff also alleges that defendant Parker held a meeting about this class action suit. Talbert Aff. ¶ 80. He claims that at some point defendant Parker told him that "you need to go to an institution where there are inmates waiting around corners with knives for you." Id. ¶ 82. However, plaintiff also states that defendant Parker had told the media that she was sometimes afraid for her safety while working in the prison setting. Therefore, it is unclear whether defendant Parker's statements were made as threats to plaintiff or as general statements about her fears. Plaintiff further claims that defendant Parker, at some point before this lawsuit was brought and for unspecified reasons, told plaintiff that she would "walk into the ICC and see that you are slandered." Id. ¶ 83.

On September 8, 1994, an inmate asked plaintiff for assistance finding updated Division Operating Procedures. Id. ¶ 96–98. Plaintiff could not find them and asked defendant Parker about them. Id. ¶ 101. Defendant Parker allegedly told plaintiff to stop attempting to run the Department of Corrections. Id. Plaintiff then assisted this other inmate in editing and typing a letter. Id. ¶¶ 104–05. He later saw defendant Parker reading a copy of this letter. Id. ¶ 106. Later that day, plaintiff was suspended from his job at the library. Although plaintiff admits that he was suspended "for writing a letter for another inmate" in his brief, Pl.'s Br. in Opp'n at 13, he contends that the real reason for the suspension was to hinder his lawsuit, see Am.Compl. ¶ 106.

Mr. Whisenant and plaintiff began receiving responses to their letters on September 7, 1994. Talbert Aff. ¶ 94. Plaintiff claims that he began showing these letters to other inmates and brought them to the attention of everyone participating in a history class he attended on the evening of September 9, 1994. Id. ¶ 78, Am.Compl. ¶¶ 55–58. Plaintiff argues that there was no danger in showing such letters to any inmate who was interested in reading them. Am.Compl. ¶ 55.

In the early morning of September 10, 1994, plaintiff was awakened and placed in segregation by a number of the defendant correctional officers. Id. ¶¶ 60–63. His property was collected and inventoried by some of the defendant correctional officers. Id. ¶ 66. Plaintiff was charged with possession of contraband. Id. ¶ 70. He was brought a Major Offense Report listing the charges, but he refused to sign it. Id.; Pl.'s Br. in Opp'n, Exh. C. Although plaintiff states that he did have contraband in his cell, he also claims that some of the correctional officers in his unit had allowed him to keep it. Pl.'s Br. in Opp'n at 19. Plaintiff alleges that his due process rights were violated by the correctional officers who brought the charges.[9] Am.Compl. ¶ 71.

On September 13, 1994, plaintiff was brought to an ICC hearing. Id. ¶ 76. The ICC members included defendants Villars, Smith, Philips, and Noirot. Id. They told plaintiff that he was being investigated for "alleged activities in the law library." Id. ¶ 77. Plaintiff informed them of his class action suit and of defendant Parker's treatment of him. Id. ¶ 78–81.

Later that evening, plaintiff was brought to a disciplinary hearing where he received five days in isolation. Id. ¶¶ 84–87. This hearing was apparently for the charge of possession of contraband. Parker Aff. ¶ 11.

On September 14, 1994, plaintiff was provided with a Notification of Referral to Institutional Classification Committee (ICC), which indicated that the investigation was complete and that he would be reviewed for possible transfer. See Pl.'s Br. in Opp'n, Exh. E. He apparently refused to sign this or request witnesses. See id.

The following day, plaintiff was transferred to ACC, a maximum security facility,[10] without any further hearing on the matter. Am. Compl. ¶ 92.

The documentation regarding the ICC hearings indicates that plaintiff was under investigation for "engag[ing] in practices detrimental to the orderly operations of this institution." Parker Aff., Exh. G. Defendant

9. As the court has noted previously, it will not consider such claims of due process violations in the present action.

10. HCC is a medium security institution. Am. Compl. ¶ 93.

Parker alleges that she received confidential information that plaintiff was attempting to incite other inmates at HCC to cause a demonstration. *Id.* ¶ 5. Defendants further claim that plaintiff had been seen attempting to incite other inmates against another inmate worker at the law library. *Id.* ¶ 6. Defendants maintain that they were concerned about a possible riot breaking out within their institution. *Id.* ¶ 7; *see also* Laura Lafay, *A Wave of Prison Unrest as Legislators Consider Parole, Inmates Remain Locked Down,* Virginia–Pilot & Ledger Star, Sept. 27, 1994, at A1 (indicating that eight prisons had been locked down since August in a wave of unrest which crested on September 19, 1994, due to Governor Allen's plan to abolish parole).

The court takes judicial notice that disturbances occurred at Dillwyn Correctional Center in August of 1994 and at both Greensville Correctional Center and HCC on September 19, 1994. *Two Lockdowns Follow Prison Unrest,* Richmond Times–Dispatch, Sept. 25, 1994, at B3 (discussing the lockdowns at Greensville Correctional Center and HCC following disturbances); Jamie C. Ruff, *Prison Bars Hamper Love,* Richmond Times–Dispatch, Aug. 28, 1994, at B5 (discussing the Dillwyn uprising). The underlying cause of these riots was believed to be Governor Allen's new parole initiatives. *Virginia Lawmakers Delay Vote on Parole; Hearings Planned; Unrest Flares at Greensville Prison,* Wash. Post, Sept. 20, 1994, at B1.

Plaintiff asserts that he was not attempting to incite the inmates at HCC into starting a riot, nor was there a riot at HCC. Talbert Aff. ¶ 69. The court notes that although there was no disturbance on September 10, 1994, there was one nine days later. *See* discussion *supra.* Plaintiff admits that he and inmate Whisenant had some type of disagreement with another inmate law clerk who stole a copy of the class action complaint they had drafted. *Id.* ¶ 113. This other inmate apparently gave "their" complaint to another inmate who filed it with the court.

*Id.* Plaintiff maintains, however, that there was never a "situation" which necessitated staff or inmate involvement. *Id.* ¶ 114.

Upon plaintiff's transfer to ACC, he was placed in segregation and then, following a series of hearings, was placed in general population in October of 1994. Talbert Aff. ¶¶ 120–23. On December 6, 1994, he was transferred to ICCC. *Id.* ¶ 125. Plaintiff alleges that defendants Huffman, Hinkle, Mitchell, and Parker were responsible for his transfer to ACC. *Id.* ¶ 132. He alleges that his transfer to a maximum security facility was arranged either to punish him for sharing the senator's letter or to hinder his litigation activities. *See, e.g.,* Am.Compl. ¶ 102.

Plaintiff claims that after he was transferred, the district court denied the request for class certification in the lawsuit he and Mr. Whisenant had filed in August of 1994. Talbert Aff. ¶ 6. The court notes that by Order entered September 28, 1994, class certification was denied in plaintiff's class action lawsuit. *Whisenant v. Allen,* No. 2:94cv946, slip op. at 1–2 (E.D.Va. Sept. 28, 1994). The court explained that "the competence of an inmate representing himself is too limited to allow him to represent the rights of other inmates as well" and that even though Mr. Whisenant was a certified paralegal, "this does not necessarily make him able to adequately represent the rights of other inmates." *Id.* Because the case was not certified as a class action and because the two plaintiffs no longer were incarcerated in the same correctional facility, the court ordered the case severed into two separate actions.[11] *Id.* at 2. The court also noted that it was unable to determine whether plaintiffs had even stated a cognizable claim for damages under section 1983. *Id.* at 3.

Both actions were later dismissed without prejudice at the request of each inmate. *See Talbert v. Allen,* No. 2:94cv947 (E.D.Va. Oct. 7, 1994);[12] *Whisenant v. Allen,* No.

---

11. Severing cases brought by multiple inmates is a typical practice of this court.

12. Plaintiff requested a voluntary dismissal because he had transferred to ACC and everything, except a copy of the original complaint, was missing.

2:94cv946 (E.D.Va. Oct. 14, 1994).[13] Plaintiff claims that his legal materials disappeared following his transfer to ACC, but states that he is unsure which individuals at HCC are responsible for the temporary misplacement of his property. Talbert Aff. ¶ 134. He alleges that he did not receive these materials from HCC until September of 1995. Am. Compl. at 44–45.

Plaintiff also alleges that he was subjected to various due process violations as well as receiving inadequate medical treatment at ACC and ICCC. *Id.* ¶ 118 *et seq.* He claims that these alleged violations were perpetrated by defendants at these two institutions who were colluding with the HCC defendants to continue a course of retaliation against him. *Id.*

**D. Applicable Law**

A state official may not retaliate against an individual for the exercise of a constitutional right. *ACLU v. Wicomico County,* 999 F.2d 780, 785 (4th Cir.1993) (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). The Fourth Circuit has noted that in the prison context, retaliation claims should be treated with skepticism. *Cochran v. Morris,* 73 F.3d 1310, 1317 (4th Cir.1996); *Adams v. Rice,* 40 F.3d 72, 74 (4th Cir.1994), *cert. denied,* 514 U.S. 1022, 115 S.Ct. 1371, 131 L.Ed.2d 227 (1995).

In order to prove that his rights have been violated, an inmate must show that "each retaliatory act violate[d] some constitutional right of an inmate or constitute[d] punishment for the exercise of a constitutional right." *Cochran,* 73 F.3d at 1318 (citing *Adams,* 40 F.3d at 75). Plaintiff must also show that he "suffered some adversity in response to [his] exercise of protected rights." *Wicomico County,* 999 F.2d at 785; *accord Huang v. Board of Governors,* 902 F.2d 1134, 1140 (4th Cir.1990). Where plaintiff claims that he suffered retaliation for filing a lawsuit, he must show that the retaliatory acts adversely impacted his right to access the courts. *Wicomico County,* 999

F.2d at 785. The adverse impact must be more than a *de minimis* inconvenience. *Id.* at 786 n. 6.

In addition, plaintiff must demonstrate causation—that the protected conduct was a "substantial" or "motivating factor" in the defendants' decision. *Mt. Healthy City School Dist.,* 429 U.S. at 287, 97 S.Ct. at 576. If plaintiff successfully shows causation, the burden then shifts to defendants who must demonstrate that they would have made the same decision in the absence of plaintiff's protected conduct. *Mt. Healthy City School Dist.,* 429 U.S. at 287, 97 S.Ct. at 576; *see also Woods v. Edwards,* 51 F.3d 577, 580–81 (5th Cir.1995) (summary judgment affirmed where prison officials showed non-retaliatory justification for actions and inmate offered no evidence other than his personal belief that the actions were based on his exercise of rights).

The Supreme Court has stated that prisoners retain their First Amendment rights "not inconsistent with [their] status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Consequently, in cases involving prisoner retaliation claims, many courts have interpreted this language to require prisoners to show that the officials' actions did not advance legitimate penological objectives. *Rizzo v. Dawson,* 778 F.2d 527, 532 (9th Cir.1985); *Abdul–Akbar v. Department of Corrections,* 910 F.Supp. 986, 1000–01 (D.Del.1995) (holding that, because claims of retaliation have potential for abuse, in order to state a claim for unconstitutional retaliation, inmate "must allege that the 'retaliatory' conduct does not advance legitimate penological goals such as preserving institutional order and discipline"); *Cook v. Lehman,* 863 F.Supp. 207, 212 (E.D.Pa.1994) (even if a prison official's conduct affects protected First Amendment rights, courts should defer to the official's decisions which are aimed at protecting internal security and order, so long as they are "reasonably related to legitimate penological interests") (citing

---

**13.** Mr. Whisenant requested a voluntary dismissal because he had failed to exhaust his state remedies.

*Thornburgh v. Abbott,* 490 U.S. 401, 413, 109 S.Ct. 1874, 1881–82, 104 L.Ed.2d 459 (1989)).

### E. Analysis

#### 1. Defendants not mentioned in complaint or amended complaint

Upon scrutiny of plaintiff's complaint and amended complaint, the court cannot find any factual assertions made against defendants B. Lewis, Nurse Elam, or C/O Chamblee. Accordingly, summary judgment is **GRANTED** in favor of these three defendants.

#### 2. Claim regarding loss of library job

■ Plaintiff, along with fellow inmate Steven Whisenant, filed a lawsuit against Governor Allen and the parole board members on or about August 1, 1994, in which they sought certification of the suit as a class action. Plaintiff claims that defendant Parker fired him from his job at the library in order to retaliate against him for filing this lawsuit.[14]

The court notes that there are some factual disputes, and that for purposes of summary judgment, the Court must view the record as a whole and in the light most favorable to the nonmoving party. *See, e.g., Celotex Corp.,* 477 U.S. at 322–24, 106 S.Ct. at 2552–53. However, these factual issues are not material to the disposition of this claim.

Plaintiff's first claim fails for two reasons. First, plaintiff has not shown that his discharge from the library adversely impacted his right of access to the courts. As the Fourth Circuit found in *Wicomico County,* the issue of motivation is not material if, at the threshold, plaintiff has failed to show a sufficient adverse impact on a constitutional

right to support a claim of retaliation. 999 F.2d at 785.

Plaintiff has not alleged that defendant Parker, in firing him, forbade him to use the library resources. The court assumes and plaintiff does not contradict that, while plaintiff was on duty at the library, he was typing and doing clerical work pertaining to lawsuits filed by his fellow inmates and not conducting research for lawsuits to which he was a party. Consequently, the loss of the job at the library would have, at most, a *de minimis* impact on his ability to continue to litigate his own lawsuits.

Furthermore, although he makes conclusory statements claiming that he has been "barred from litigation" by defendant Parker's actions, Pl.'s Br. in Opp'n at 20, plaintiff has failed to describe with particularity how his litigation efforts have been "barred." As to the lawsuit he filed with Mr. Whisenant, class certification was denied shortly after the events plaintiff complains of in the present action and for reasons unrelated to plaintiff's claims in the present lawsuit. In addition, plaintiff requested a voluntary dismissal of the suit soon thereafter. The Fourth Circuit has stated that "the withdrawal of complaints on plaintiff's motion and without prejudice does not rise in any event to the level of actual injury that [is] require[d]" to establish an access-to-courts claim. *Cochran,* 73 F.3d at 1317 (citing *Strickler v. Waters,* 989 F.2d 1375, 1384 (4th Cir.), *cert. denied,* 510 U.S. 949, 114 S.Ct. 393, 126 L.Ed.2d 341 (1993)). Moreover, it is apparent that plaintiff was not prejudiced by any alleged impact the loss of his library job had on his lawsuit from the fact that the complaint he and Mr. Whisenant submitted itself lacked merit.[15] *Strickler,* 989 F.2d at 1383 n. 12.

Finally, since plaintiff was fired from his library job, in addition to filing the discursive

---

14. Although plaintiff initially claimed that defendant's actions were in response to his filing of grievances and lawsuits, he subsequently maintained that the retaliatory actions were specifically in response to the class action lawsuit. *See, e.g.,* Pl.'s Br. in Opp'n at 1, 3.

15. This court has received similar lawsuits on this parole board issue which the court has dismissed. *See, e.g., Titus v. Angelone,* No. 2:96cv49 (Jan. 3, 1997) (unpublished); *see also Vann v.*

*Angelone,* 73 F.3d 519, 521–22 (4th Cir.1996) (stating that because there is no constitutional right to parole, if a state chooses to establish a system of parole, the state's parole authorities are given "a wide range for experimentation and the exercise of discretion") (citing *Franklin v. Shields,* 569 F.2d 784, 800 (4th Cir.1977), *cert. denied,* 435 U.S. 1003, 98 S.Ct. 1659, 56 L.Ed.2d 92 (1978)).

complaint at hand, plaintiff has filed two habeas petitions with this court. In these actions, plaintiff has submitted extremely lengthy briefs which have included countless citations. Plaintiff's litigation activities do not appear to have been impeded by his loss of the law library job. Plaintiff therefore has "failed to establish the adverse impact necessary to a retaliation claim and thus [has] failed to assert a constitutional violation." *Wicomico County,* 999 F.2d at 786.

Plaintiff's first claim also fails for lack of causation. Plaintiff claims that defendant Parker fired him from his job at the library in retaliation for a lawsuit he filed on or about August 1, 1994. From the facts that plaintiff himself alleges, however, it is clear that the problems between plaintiff and defendant Parker arose months before the filing of the lawsuit seeking class action certification. According to plaintiff, he was threatened by defendant the first week he worked in the library. The facts indicate that plaintiff and defendant had disagreements over a variety of issues on a number of occasions. Plaintiff had previously been demoted to a clerk/typist in June of 1994.

In addition, the court surmises from plaintiff's litany of facts that defendant Parker was concerned that the inmates at the law library were engaged in the unauthorized practice of law. Plaintiff admits that he was interested in legal training and was continually being asked to help with legal research. Plaintiff admits that on the day he was fired he had been helping another inmate with what sounds to this court like legal research. He had already been advised that he was not to help inmates with legal research in his new job capacity. Accordingly, a jury could not reasonably have found that "but for" his filing of the class action lawsuit, he would not have been fired. *Huang,* 902 F.2d at 1141. Consequently, summary judgment is plainly appropriate on this claim.

### 3. Claim against defendants at HCC

■ Plaintiff also claims that many of the prison officials at HCC, apparently in collusion with defendant Parker, transferred him to ACC either in retaliation for his filing of the class action lawsuit or for showing the senator's letter to the other inmates. Again, although there are some factual disputes, these factual issues are not material to the disposition of this claim.

The court first notes that it is unfathomable why all of these defendants would join in a "conspiracy of retaliation" over a lawsuit to which none of them were a party. Second, plaintiff has presented no factual evidence whatsoever that any defendants, besides perhaps defendant Parker, had acted in any kind of retaliatory fashion or had any reason to do so. Plaintiff has indicated that the other HCC defendants only became aware of plaintiff's class action lawsuit *after* he had been placed in segregation and was under investigation. In fact, the evidence indicates that they became aware of the lawsuit during one of the ICC hearings after *plaintiff* informed them of it. In *Adams,* the Fourth Circuit stated that in order to establish a retaliation claim an inmate must "allege how or why defendants retaliated against plaintiff," and may not "conclusorily assert[ ] that the [conduct complained of] occurred as part of defendants' general scheme of retaliation." 40 F.3d at 74–75. Here, plaintiff's claims against the other HCC prison officials are solely based upon mere speculation that any action by any official which adversely impacted him was part of a general conspiracy with defendant Parker against him. Consequently, plaintiff has failed to meet the *Adams* standard.

■ Furthermore, assuming *arguendo* that the conduct plaintiff bases his claim on—filing lawsuits and communicating with other inmates—is protected by the Constitution, his claims of retaliation still must fail. As to his first theory that defendants placed him in segregation and transferred him because of his class action lawsuit, he has not demonstrated that his filing of the lawsuit was a substantial factor in his segregation and transfer and, even if he could establish this, the prison authorities have shown ample justification for their actions.

In April of 1994, Governor Allen appointed five new members to the Virginia Parole Board. *Allen Names Metzger Parole Board Chairman,* Roanoke Times & World News,

April 2, 1994, at C3. These new members included law enforcement officials and prior victims of crimes. *Id.* Governor Allen also scheduled a legislative session in September of 1994 to consider his proposal to abolish parole. Peter Baker, *Allen Offers Plan to Abolish Parole,* Wash. Post, August 17, 1994, at A1. It is undisputed that disturbances occurred at Dillwyn Correctional Center, Greensville Correctional Center, and HCC during this time period and that these disturbances were believed to have been caused or exacerbated by the increased tensions over the parole issues. *Virginia Lawmakers Delay Vote on Parole: Hearings Planned: Unrest Flares at Greensville Prison,* Wash. Post, Sept. 20, 1994, at B1 (quoting Ron Angelone, Director the Virginia Department of Corrections, who acknowledged that there was "extra tension as a result of the parole debate" at the correctional facilities). It was also believed that letters sent to the inmates asking them to oppose the parole plan had "aggravated" the situation. *Id.* It is also clear that prison officials at all correctional facilities, including HCC, were very concerned about possible riots breaking out in their prisons. *Id.*

Plaintiff admits that he was passing around the Senator's letter regarding the parole issue to many of the inmates at HCC. He indicates that he believed this may have triggered his segregation. The ICC's report states that he was being investigated for "activities which could cause disruptions to the orderly operations of this institution." Parker Aff., Exh. G. Hence, rather than appearing that the charges were substantially motivated by plaintiff's past litigation activities, the evidence indicates that the prison officials had reason to believe either that plaintiff was attempting to incite a demonstration over this same issue or, at the very least, plaintiff's showing of the letter to other inmates would have increased tensions over the parole issue, leading to a demonstration the officials were seeking to avoid. In light of the fact that some of the prison disturbances may have been caused by letters asking the inmates to oppose the parole initiatives, defendants' fears were clearly justified. Consequently, the facts in this case demonstrate that the prison officials would have made the same decision to segregate and transfer Talbert in the absence of plaintiff's litigation activities. Accordingly, this claim fails for lack of causation.[16]

Furthermore, plaintiff has failed to establish that defendants' actions in segregating and transferring him did not advance legitimate penological objectives. Although plaintiff denies attempting to instigate a demonstration at HCC, even if plaintiff did not intend to start a riot, his actions during September of 1994 could have created serious security problems at the correctional facility. Consequently, defendants have amply demonstrated that their decision was aimed at protecting internal security. *Cook,* 863 F.Supp. at 212. Moreover, even though plaintiff had recently filed a class action lawsuit, the officials, including defendant Parker, had the responsibility to take steps against plaintiff for his suspected involvement in creating a disturbance at the correctional facility. This court cannot expect correctional officers to decline to take action against an inmate who may be a security risk merely because the inmate has filed lawsuits in the past. *See Abdul–Akbar,* 910 F.Supp. at 1001 (finding that even though inmate had filed numerous lawsuits and grievances against prison officials and the officials may have harbored ill will against the inmate, officials' actions advanced legitimate penological goals). Thus, even if defendant Parker, who knew of plaintiff's lawsuit and allegedly was angry about it, was involved in charging plaintiff with attempting to instigate a riot, this charge was reasonable in light of the legitimate penological interests of the prison.

■ Plaintiff's second retaliation theory against the HCC defendants, that they segregated and transferred him in retaliation for displaying the senator's letter to other in-

---

**16.** There is also some factual evidence which suggests that plaintiff had attempted to instigate a fight against another inmate library worker. Defendants claim that such a situation did occur, and, although plaintiff claims that no "intervention" was needed, he does admit that he and inmate Whisenant had a disagreement with another inmate. *See* discussion *supra.* Defendants, therefore, also had another potential security problem to deal with.

mates, also fails on summary judgment. Under *Pell,* plaintiff retains his First Amendment rights—here, presumably, the right to free speech—insofar as it is not "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." 417 U.S. at 822, 94 S.Ct. at 2804. Thus, although his sharing of the senator's letter may have led to his segregation and transfer, the prison officials have demonstrated that plaintiff's actions created a potentially serious security risk. Defendants, therefore, have shown that they had legitimate penological reasons for the subsequent segregation and transfer, and consequently, plaintiff's claims must fail on summary judgment. *Abdul-Akbar,* 910 F.Supp. at 1000–01; *Cook,* 863 F.Supp. at 212.

Accordingly, for the reasons stated above, the court **GRANTS** summary judgment for defendant Parker and the other HCC defendants on plaintiff's retaliation claims.

#### 4. Claim against ACC and ICCC officials

Plaintiff also alleges that this "conspiracy of retaliation" continued when he was transferred to ACC and ICCC. He claims numerous due process and Eighth Amendment violations by many of the prison officials at these two institutions. These alleged constitutional violations at ACC and ICCC, he maintains, are evidence that these defendants were conspiring with the defendants at HCC.

Because the court has determined that plaintiff has failed to establish retaliation by the HCC defendants, it logically follows that the defendants at ACC and ICCC could not have been in a conspiracy of retaliation with the HCC defendants. Consequently, summary judgment must also be granted on this claim. Furthermore, even if summary judgment had not been granted in favor of the HCC defendants in this action, the court still would have granted summary judgment for the prison officials at ACC and ICCC because plaintiff's claim against these defendants is meritless. Plaintiff's claim against these defendants is based upon his supposition that any and all problems he later experienced at ACC and ICCC were the result of a widespread conspiracy between officials at these two correctional facilities and HCC. There is not one shred of factual evidence that suggests retaliation was a remote factor in the decisions of any of the ACC and ICCC defendants. In fact, plaintiff's "extended litany of conspiratorial activity casts serious doubts on [his] claims." *Cochran,* 73 F.3d at 1318. In actuality, plaintiff's complaints about the defendants' actions at ACC and ICCC, at most, allege due process violations or claims of inadequate medical care which the court stated it would not address in this action.

Accordingly, summary judgment is **GRANTED** on plaintiff's retaliation claim as to all the remaining ACC and ICCC defendants—Lonnie M. Saunders, Jack Lee, S. Taylor, Rob Byrd, T. Lawhorn, V. Grant, Counselor Bady, J. Mueller, Counselor Neely, Cpt. Boyer, Lt. Redman, Sgt. Crawford, S. Murphy, M.G. Harris, Edie Pearson, Ray Arp, and Y. Moore–Rogers. *See Geder v. Godinez,* 875 F.Supp. 1334, 1339 (N.D.Ill. 1995) (dismissing all defendants for which there was no factual evidence suggesting retaliatory motives).

### III. Conclusion

For the foregoing reasons, summary judgment is **GRANTED** for all defendants. Accordingly, this case is **DISMISSED** and the Clerk is **DIRECTED** to enter judgment in favor of all defendants.

Plaintiff is advised that he may appeal from this final Order by forwarding a written notice of appeal to the Clerk of the United States District Court, United States Courthouse, 600 Granby Street, Norfolk, Virginia 23510. Said written notice must be received by the Clerk within thirty (30) days from the date of this Order.

The Clerk is **DIRECTED** to send a copy of this Order to plaintiff and to counsel for defendants.

IT IS SO **ORDERED.**